STATE OF NEBRASKA EX REL. PAUL L. DOUGLAS, ATTORNEY GENERAL OF THE STATE OF NEBRASKA, RELATOR, V.
FRANK MARSH, TREASURER OF THE STATE OF NEBRASKA; FRED A. HERRINGTON, TAX COMMISSIONER OF THE STATE OF NEBRASKA; AND BRENT R. STEVENSON, DIRECTOR OF ADMINISTRATIVE SERVICES OF THE STATE OF NEBRASKA, RESPONDENTS.

300 N.W.2d 181

Filed December 29, 1980.   No. 43463.

Paul L. Douglas, Attorney General, and Ralph H. Gillan for relator.

James E. Ryan for respondents.

Ron Lahners, Lancaster County Attorney, and Emil M. Fabian, amicus curiae.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, BRODKEY, WHITE, and HASTINGS, JJ., and COLWELL, District Judge.

KRIVOSHA, C.J.

The instant appeal is an original action filed by the Attorney General of the State of Nebraska attacking the constitutionality of sections 2, 3, 4, and 5 of L.B. 882 passed by the 86th Legislature, Second Session, and approved by the Governor of the State of Nebraska on April 23, 1980 (L.B. 882). For reasons more particularly set out hereinafter, we agree with the claim made by the Attorney General that the specific provisions of L.B. 882 attacked by the Attorney General violate the Constitution of the State of Nebraska and, accordingly, we are compelled to declare sections 2, 3, 4, and 5 of L.B. 882 invalid and unenforceable.

In order to fully understand the problems involved herein, it is necessary that we set out in detail the pertinent provisions of L.B. 882. They read as follows:

"Sec. 2. (1) There is hereby created a fund to be known as the Local Government Revenue Fund. The Local Government Revenue Fund shall contain such amounts as may be appropriated by the Legislature.

"(2) It is the intent of the Legislature that for fiscal year 1980-81 there shall be appropriated to the Local Government Revenue Fund seventy million dollars and for ensuing fiscal years there shall be appropriated to the Local Government Revenue Fund such amounts as determined by this section.

"(3) During December, 1980, and each year thereafter, the Tax Commissioner, upon receipt of the reports required by section 77-628, Reissue Revised Statutes of Nebraska, 1943, shall prepare a report showing by county the total amount of all property taxes including motor vehicle taxes levied during the current year and the immediately preceding year and the dollar amount of change as such are reported pursuant to section 77-628. Such report shall be filed on or before December 31, 1980, and each year thereafter with the Governor and the Clerk of the Legislature.

"(4) It is the intent of the Legislature that for fiscal year 1981-82 and each fiscal year thereafter there be appropriated to the fund an amount equal to the amount appropriated for the prior fiscal year, plus an amount equal to ten per cent of the amount of change in the total amount of general taxes levied as determined from the report of the Tax Commissioner filed the December 31st prior to the fiscal year of the appropriation.

"Sec. 3. The Tax Commissioner shall determine the amount of money distributed or to be distributed to each county during fiscal year 1979-80 pursuant to section 77-202.42, Revised Statutes Supplement, 1978, and shall determine the percentage each county received of the total amount so distributed. For fiscal year 1980-81 each county shall receive an amount of money from the Local Government Revenue Fund equal to the percentage of the total that each county received during the fiscal year 1979-80 times the appropriation to the Local Government Revenue Fund for the fiscal year 1980-81. For ensuing fiscal years each county shall receive an amount equal to the amount received the prior fiscal year plus an amount equal to ten per cent

of the amount of change in the total amount of general taxes levied in that county as determined pursuant to section 2 of this act. If in any fiscal year the appropriation to the Local Government Revenue Fund shall be different than the total amount for all counties as determined pursuant to section 2 of this act, then the amount to be received by each county shall be in the same portion as the total amount of the funds to be received by each county as calculated pursuant to section 2 of this act is to the total amount to be received by all counties, as calculated pursuant to section 2 of this act.

"Within ten days after the adjournment of each regular session of the Legislature the Tax Commissioner shall notify each county treasurer of the amount to be received by that county during the ensuing fiscal year from the Local Government Revenue Fund, and shall at the same time notify the State Treasurer of the amount to be received by every county during the ensuing fiscal year."

The Attorney General argues that the act is invalid on several grounds. The first ground is that the classifications created by the provisions of L.B. 882 constitute an arbitrary and unreasonable closed classification in that they prevent a county from moving from one classification to another and L.B. 882 is, therefore, a special law as to each of the state's 93 counties, contrary to Neb. Const. art. III, § 18, which provides that where a general law can be made applicable no special law shall be enacted. Likewise, the Attorney General maintains that the formula for distributing the additional money authorized by section 3 of L.B. 882 has no rational basis and is, therefore, arbitrary and capricious in violation of the Constitution of the State of Nebraska. At this point, perhaps some history leading to the adoption of L.B. 882 might be helpful in understanding the problem.

In 1970, the people of the State of Nebraska approved a constitutional amendment now found in Neb. Const.

art. VIII, § 2. The language specifically provides, in part: "The Legislature may classify personal property in such manner as it sees fit, and may exempt any of such classes, or may exempt all personal property from taxation." As a result of the adoption of that constitutional provision, the Legislature, in 1972, adopted legislation creating three general classes of personal property to receive exemptions. They were (1) livestock; (2) farm equipment, farm inventory, and grain and seed; and (3) business inventory. All three classes of property were given partial tax exemptions which increased at the rate of 12½ percent of actual value each year until 1977 when 62½ percent of the value of such property was exempt from personal property taxes. See 1972 Neb. Laws, L.B. 1241, Neb. Rev. Stat. §§ 77-202.25 to 77-202.33 (Reissue 1976).

Because the Legislature recognized that the governmental subdivision in the several counties would lose revenue by reason of the exemption, there was also created, as a part of the 1972 legislation, a "Personal Property Tax Relief Fund." See Neb. Rev. Stat. § 77-202.30 (Reissue 1976). The purpose of this fund was to reimburse the governmental subdivisions in the several counties for some part of the revenue they would otherwise lose by reason of the property located in the county being exempted from taxation. The statute prescribed the manner in which this was to be done but, in essence, the county simply reported on behalf of the various governmental subdivisions the property that was present in the county but exempt from taxation, and the state allocated funds to the county equal to that which was lost by reason of the exemption.

In 1977, the Legislature further amended the act through the passage of 1977 Neb. Laws, L.B. 518, Neb. Rev. Stat. §§ 77-202.30 and 77-202.36 to 77-202.43 (Cum. Supp. 1978). L.B. 518 eliminated the previous limitation of 62½ percent on the exempted property and provided for a total exemption for the three classes of property previously exempted in part by L.B. 1241. The

exemptions were to take effect in a planned sequence, with farm equipment and inventory being totally exempted by January 1, 1978; business inventory totally exempted by January 1, 1979; and livestock totally exempted by January 1, 1980. Neb. Rev. Stat. §§ 77-202.36, 77-202.38, and 77-202.40 (Cum. Supp. 1978). Under the provisions of L.B. 518, the state continued to reimburse the counties for the revenue lost by reason of the exemption but limited the maximum amount that would be reimbursed in any one year to $70 million. The maximum reimbursement was to take effect in 1980. Neb. Rev. Stat. § 77-202.41 (Cum. Supp. 1978).

Due to the fact that, under the provisions of L.B. 518, the entire class of property was to be exempted, no reporting was thereafter required to be made to the state as it had been done in earlier years. This, therefore, now made it impossible for the state to determine the amount of the loss suffered by each county by reason of the exemptions and, likewise, made it impossible for the state to reimburse to the counties the exact amount lost by reason of the exemption. To solve this problem, the Legislature determined that it would simply reimburse each county the same pro rata share of the Personal Property Tax Relief Fund as the county had received pursuant to its certification for the year 1976, plus a further amount lost due to the creation of a freeport exemption in certain counties. The freeport exemption was authorized by the provisions of Neb. Const. art. VIII, § 2A, which exempted from taxation intransit goods, wares, and merchandise held in licensed warehouses or storage areas. While the Attorney General raises some question as to the validity of the formula contained in L.B. 518, in view of the fact that L.B. 882 repealed the provisions of L.B. 518, we need not concern ourselves with that matter except to note that the result of the formula created by L.B. 518 was to freeze the percentage of the fund distributed to each county in future years at that figure which represented the county's actual losses in 1976, plus the freeport reim-

bursement, where applicable, determined as provided by statute. See Neb. Rev. Stat § 77-202.42 (Cum. Supp. 1978). For reasons already noted, it is unnecessary for us to consider the provisions of either L.B. 1241 or L.B. 518. For purposes of our discussion herein, however, we call attention to the fact that the principal concept embodied in both L.B. 1241, adopted in 1972, and L.B. 518, adopted in 1977, was to reimburse counties, in full or in part, for the funds actually lost due to the steadily increasing personal property tax exemption.

The adoption of L.B. 882 in 1980 eliminated the Personal Property Tax Relief Fund and abolished the reimbursement concept contained in both L.B. 1241 and L.B. 518. In its stead, the Legislature created what was identified in L.B. 882 as the "Local Government Revenue Fund." Neb. Rev. Stat. § 77-3601 (Cum. Supp. 1980). The Local Government Revenue Fund created by L.B. 882 and the distribution of those funds to the various counties in no way is dependent upon any continuing loss of revenue caused by property actually being located in the county but exempt from taxation. Rather, distribution is more in the form of state aid to governmental subdivisions and is based upon a formula set out in the statute and which, once created, cannot be changed regardless of a change in circumstances. The fact that it has nothing to do with reimbursement is quite clear when one recognizes that under the reporting provisions of L.B. 882, the state is never advised as to the amount of property present in the county but exempt from taxation. There is no absolute constitutional prohibition against the state granting aid to governmental subdivisions. The formula for granting the aid, however, must be of such nature that similar governmental subdivisions are treated in a similar manner and, as circumstances change, adjustments between governmental subdivisions are made. Under L.B. 882 that does not happen.

Section 3 of the act simply directs the State Tax Commissioner to determine the amount of money distributed or to be distributed to each county during the fiscal year 1979-80 pursuant to § 77-202.42 (Cum. Supp. 1978) which was the formula created under the provisions of L.B. 518. For the fiscal year 1980-81 each county is to receive an amount of money equal to the percentage of the total that each county received during the fiscal year 1979-80 times the appropriation to the Local Government Revenue Fund for the fiscal year 1980-81. In other words, once it is determined how much the county is to receive for the year 1979-80, then it is to receive that same amount each year thereafter during the life of L.B. 882, without regard to whether there has been an increase or decrease of exempt property in the county. In addition to the fixed amount, each county may also receive an amount equal to 10 percent of the amount of change in the total amount of general taxes levied in the county as determined pursuant to section 2 of L.B. 882. Presumably, the thought was that as more property is exempt from taxation, more general taxes will have to be levied in the county to make up the difference. This assumption, however, is not necessarily valid nor can it be determined by anything contained in the law. The increase may come about simply by reason of the various governmental subdivisions determining to levy higher taxes, subject, of course, only to the lid limitations, or it may result in a reduction in total taxes levied by reason of a county's desire to spend less money in a given year. In any event, no one can determine how the increase in general taxes levied in the county is related to the exemption of property or the payment of state funds.

Finally, section 3 provides that in the event that insufficient money is appropriated by the Legislature to make all of the distribution otherwise required, each county shall receive a proportionate share of the total appropriated by the Legislature based upon the formulas otherwise contained in section 3.

At the outset, we are asked to determine whether the Legislature has acted within its constitutional authority or, in fact, has exceeded the provisions of the Nebraska Constitution. That is always a difficult question in that courts are reluctant to interfere with the action of the Legislature and recognize that the Legislature has broad discretion in the exercise of its legislative powers. We have oftentimes recognized in our decisions that in construing an act of the Legislature all reasonable doubts must be resolved in favor of its constitutionality. *State ex rel. Douglas v. Nebraska Mortgage Finance Fund,* 204 Neb. 445, 283 N.W.2d 12 (1979). The court, in construing the meaning of a statute, should, if possible, discover the legislative intent from the language and give it effect. *Pelzer v. City of Bellevue,* 198 Neb. 19, 251 N.W.2d 662 (1977). Notwithstanding those admonitions, our examination of the provisions of L.B. 882 compel us to find the act is in violation of the Constitution of the State of Nebraska as urged by the Attorney General.

Turning first to the matter of the frozen classification, we find no way to overcome that defect. An examination of all of the legislative history leading up to the adoption of L.B. 882, scant as it is, does not in any manner aid us in our determination herein or provide us with any additional understanding or background as to how the distribution of state funds under L.B. 882 might operate so as not to be in violation of the Constitution. Having determined that the amount to be paid to the county is based upon a formula established in 1977 and thereafter to be followed without regard to change in circumstances does, indeed, create a frozen classification into which no other county may enter even though it may subsequently acquire the very same characteristics which afforded the first county the benefits it receives. Perhaps two examples best illustrate the problem. Certain livestock might have been kept in county A when the formula under L.B. 518 was first determined. Under the previous legislative acts, having

been in the county and reported as exempt, the county received reimbursement. If those cattle are then moved to adjoining county B where they are now located, county A continues to receive the same payment even though the property is no longer located in that county and would not have been available for taxation but for the exemption; and county B, which has now acquired the property and which, but for the exemption, would be entitled to tax the property, receives no payment. It appears that the criteria which granted compensation to county A in the first instance is inapplicable to county B when the property is moved.

Likewise, consider the matter of business inventory. Inventory may have been located in county A when the formula was created. By reason of either the business terminating or moving to another county, the inventory may no longer be in county A and may, in fact, now be in adjoining county B. Yet, county A continues to receive the same money and county B receives no increase. The reason for that division is totally without any rational basis and must, therefore, be considered to be arbitrary and capricious, having been created by legislation special to each county. While the question of classification is one primarily for the Legislature and in the exercise of this power the Legislature possesses a wide discretion, there must, nevertheless, be some rational basis for the classification. See 16A C.J.S. *Constitutional Law* § 489, p. 247 and following (1956).

In *State v. Kelso*, 92 Neb. 628, 632, 139 N.W. 226, 227-28 (1912), we said, "The rule appears to be settled by an almost unbroken line of decisions that a classification which limits the application of the law to present condition, and leaves no room or opportunity for an increase in the numbers of the class by future growth or development, is special, and a violation of the clause of the constitution above quoted. It follows that the limitation in the act to all county seats which had existed for ten successive years at the time of the pas-

sage of the act, and not permitting the rule to be applied to other counties, is equivalent to the naming of the county seats of that class, and is therefore void."

The *Kelso* rule remains the law of this state and was reaffirmed by this court in *City of Scottsbluff v. Tiemann*, 185 Neb. 256, 261, 175 N.W.2d 74, 79 (1970), wherein we said: "The law is unmistakably clear that a statute classifying cities for legislative purposes in such a way that no other city may ever be added to the class violates the constitutional provision forbidding special laws where general laws can be applicable." See, also, *Axberg v. City of Lincoln*, 141 Neb. 55, 2 N.W.2d 613 (1942). No matter what may happen in the future with regard to the location of exempt property, once the amount to be paid by the state to each of the several counties is determined, no change with regard to that basic formula may thereafter be made. Such provision clearly flies in the face of the prohibition contained in Neb. Const. art. III, § 18.

Likewise, the reason for creating such classifications, which appear to number 93, is totally lost in the act. While it is true that the Legislature may classify where reasonable (see *State ex rel. Douglas v. Nebraska Mortgage Finance Fund, supra*), it may not do so in an arbitrary manner. In *City of Scottsbluff v. Tiemann, supra* at 266, 175 N.W.2d at 81, we specifically said: "It is competent for the Legislature to classify objects of legislation and if the classification is reasonable and not arbitrary, it is a legitimate exercise of legislative power. [Citation omitted.] The classification must rest upon real differences in situation and circumstances surrounding members of the class relative to the subject of the legislation which renders appropriate its enactment. [Citations omitted.] The power of classification rests with the Legislature and cannot be interfered with by the courts unless it is clearly apparent that the Legislature has by artificial and baseless classification attempted to evade and violate provisions of the Constitution prohibiting local and special legislation.

[Citation omitted.] A legislative classification, in order to be valid, must be based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified. *Classifications for the purpose of legislation must be real and not illusive; they cannot be based on distinctions without a substantial difference.* [Citations omitted.]" (Emphasis in original.) And in the case of *Campbell v. City of Lincoln,* 195 Neb. 703, 709, 240 N.W.2d 339, 342 (1976), we said: "Classification is proper if the special class has some reasonable distinction from other subjects of a like general character, which distinction bears some reasonable relation to the legitimate objectives and purposes of the legislation. The question is always whether the things or persons classified by the act form by themselves a proper and legitimate class with reference to the purpose of the act."

We fail to see how it can be argued that there is any reasonable classification when the classes in the first instance are based upon historic facts alone. To be sure, if the formula were continued to be used in future years and adjustments made accordingly, the action of the Legislature might be held to be reasonable; but where it is determined that the classification is based upon happenstance events in a given year and thereafter remains forever, regardless of the changes in circumstances, the classification must be held to be invalid and the act in violation of our State Constitution.

Likewise, what we have said with regard to the overall classification applies equally as well to the payment of the additional 10 percent. As the act notes, the only factor to be taken into account by the Tax Commissioner is whether the amount of general taxes levied in the county in a subsequent year is greater than it was in the immediate prior year. When that occurs, the county is to receive an amount equal to 10 percent of the increase. While the act is silent as to the reverse

situation, one must presume that if the general taxes levied in a county in a subsequent year is less than it was in the prior year, the Tax Commissioner is to withhold an amount equal to 10 percent of the reduction. This then seems to indicate that if a county within its lid limitations imposes a higher mill levy, thereby raising more general taxes, it is rewarded by receiving an additional 10 percent. On the other hand, if it acts cautiously and carefully, reducing the general tax levy, it is penalized by receiving 10 percent less. It is difficult, if not impossible, on the state of the record to understand how that, in any manner, would promote the objects sought to be promoted by the provisions of either L.B. 882 or the earlier exemption statutes and how that has any rational basis. We must, therefore, conclude that the provisions of section 3 of L.B. 882, as outlined herein, are arbitrary and capricious and bear no reasonable relationship to the purposes sought to be attained.

Respondent urges us to find the act valid, maintaining that even if the current formula is frozen, the Legislature is always at liberty to amend the law and open the class. While that may be true, that is not a matter of immediate concern to us in examining the constitutionality of the act. The question before us is not whether the Legislature might correct the defect at some future date but whether, in fact, the act, as presented to us now, is defective. As we noted in *Bachus v. Swanson*, 179 Neb. 1, 8, 136 N.W.2d 189, 194 (1965), "The constitutional validity of an act of the Legislature is to be tested and determined not by what has been or possibly may be done under it, but by what the law authorized to be done under and by virtue of its provisions." On that basis, we must conclude that section 3 is defective for all of the reasons more particularly set out above.

Having reached the conclusion we have, we are com-

pelled to grant the relief sought by the Attorney General and declare sections 2, 3, 4, and 5 of L.B. 882 invalid and unenforceable.

JUDGMENT FOR RELATOR.