REQUESTED BY: Senator Calvin F. Carsten Member of the Legislature State Capitol Lincoln, Nebraska 68509
Dear Senator Carsten:
With your letter of March 27, 1981, you submitted a copy of amendments to LB 284, and asked our opinion as to the constitutionality of the first five sections of the bill, as amended. In view of the fact that your request came in Friday afternoon, and you want our reply by Tuesday, we have been unable to do the research we would like to have done on this complex bill, and can give you only our general impressions. An answer is made more difficult by the fact that section 18 of the bill, as amended, provides that the provisions of the bill are nonseverable, and that if any portion of the bill is held invalid, the entire bill is void.
Sections 1 through 5 of the bill provide for the distribution to the taxing agencies of the state of state funds to replace revenue lost by such agencies because of the exemptions granted by Neb.Rev.Stat. § 77-202 (Supp. 1980), subsections (6), (7), (8), and (9). A similar attempt to replace such losses was held invalid in State ex rel.Douglas v. Marsh, 207 Neb. 598 (1980) as creating frozen classes, and as providing for unreasonable classification. The question is whether sections 1 through 5 of LB 284 correct such deficiencies.
Section 2 of the bill provides for the distribution to the taxing agencies of $72,500,000 in fiscal year 1980-81, and $70,000,000 in fiscal year 1981-82. These sums are to be distributed by the state to the counties, and then distributed by the counties to the taxing agencies within the counties. We will discuss first the distributions to the counties.
What the act does is distribute to the counties in 1980-81 $39,353,600 based on each county's assessed valuation of agricultural real estate, $32,146,400 based on its assessed valuation of commercial-industrial real estate, and $1,000,000 based on its assessed valuation of suburban-residential real estate. In 1981-82 the figures are $37,977,600 based on agricultural real estate, $31,022,400 based on commercial-industrial real estate, and $1,000,000 based on suburban-residential real estate.
At first glance these figures may appear totally arbitrary, but on analysis it becomes clear that what has been done is to assign $1,000,000 each of the two years involved to suburban-residential property, and then divide the balances of $71,500,000 and $69,000,000 between agricultural and commercial-industrial real estate on the basis of agricultural getting 55.04 per cent of such balances, and commercial-industrial getting 44.96 per cent.
The material attached to your request letter shows where these percentage figures come from. The exemption now found in § 77-202, subsections 6, 7, 8, and 9, and formerly found in § 77-202.25, et seq., before their repeal in 1980, deal with various classes of agriculturally related personal property, and with business inventory, which is related to commercial-industrial businesses.
The three year average for the years 1975 through 1977 show that in those years the total agriculturally-related exemption losses amounted to 55.04 per cent, and the business inventory exemption losses 44.96 per cent of the total exemption losses claimed under the above statutory provisions. As we understand it, it is felt that a small percentage of the exemptions were claimed by persons owning neither agricultural nor commercial industrial property, who operated out of their own homes. For this reason, the bill allocates $1,000,000 each of the two years on the basis of the assessed valuation of residential property.
The balance is to be allocated on the basis of the three-year average. The rationale is that there should be a rough correlation between the amount of agricultural real estate in a county and the agriculturally-related exemptions claimed in that county, and the same correlation between commercial industrial real estate and business inventories. We are not prepared to say that that premise is wholly irrational.
Another necessary premise is that the ratio between agricultural exemptions and business inventory exemptions remains relatively constant from year to year. The figures presented tend to support that premise. The highest percentage for agriculture exemptions in that three year period was 56.5 per cent, and the lowest was 53.6 per cent. The three year average of 55.04 per cent seems reasonably accurate, in view of the fact that it is no longer possible to get current figures.
The sums appropriated for the two years in question, then, are to be divided by allocating $1,000,000 to residential property, and the balance on the basis of the three year averages. The residential percentage is assumed to be nominal, and a nominal amount is allocated to it.
Legislative classification is not required to be exact. In Elliott v. Ehrlich, 203 Neb. 790, 280 N.W.2d 637
(1979), the court quoted the following language fromDandridge v. Williams, 397 U.S. 471 (1970):
 "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some `reasonable basis,' it does not offend the Constitution simply because the classification `is not made with mathematical nicety or because in practice it results in some inequality.' * * * `A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'"
There is the question of frozen classification, since the percentages are based upon 1975 to 1977 data. If this were to be a continuing program, we might question whether the percentages thus established could be used for all time, since changing economic conditions might change the relationship between the two classes of exemptions. However, since the appropriations are to be made only for the years 1980-81 and 1981-82, we believe the court would hold that the Legislature could reasonably find that there has not been enough change between the years used and the present to invalidate the percentages.
We believe there is a problem with respect to the last sentence of section 2 of the bill, which provides that for fiscal year 1980-81 funds shall be distributed on the basis of the County Abstract of Assessment Form 45, and for fiscal year 1981-82 they shall be distributed on the basis of that form as equalized by the State Board of Equalization and Assessment.
That form is the form used by the county to certify its values to the State Board of Equalization and Assessment, pursuant to Neb.Rev.Stat. § 77-1514 (Reissue 1976). The State Board, of course, is authorized to change those values, and the values, as changed, are those used by the county in levying taxes. For some inexplicable reason, the provision in question seems to require that for one year any changes made by the State Board of Equalization and Assessment shall be ignored, and values which were not actually used in the taxation process shall be used in calculating a county's share of the fund. This seems palpably arbitrary and capricious.
A possibly troublesome problem comes up with respect to the distributions within the county.
The distributions to the counties are made on the basis of assessed valuation of real estate. The distributionswithin the county are made on an entirely unrelated basis, the amount of property tax levied by each taxing agency within the county. Of course, the amount of tax levied is dependent entirely upon the budget of the agency, and not upon the amount of taxable property in the area covered by the taxing agency. An argument might be made that this is arbitrary. A similar provision was found in LB 882, the bill which was invalidated in State ex rel. Douglas v.Marsh, but this particular provision was not attacked or discussed by the court.
In the same vein, it could be argued that the tax loss due to exemptions is largely a function of the size of the mill levies, which may be unrelated to the value of real estate in the county.
Given the broad discretion vested in the Legislature in establishing classification, we believe a reasonable defense could be made against such an attack. Certainly the distributions to the counties will not result in exact replacement for tax lost because of the exemptions, and arguably, counties may not all receive the same proportions of such losses. The same can, no doubt, be said of the distributions to the taxing agencies within the counties. Nevertheless, we believe a tenable argument can be made that the formula is not wholly arbitrary and capricious, and that the Legislature was using the best criteria available.
We must, however, point out that in State ex rel.Douglas v. Marsh the court held that increases in taxes levied were not a reasonable basis for distributing a part of the funds involved therein. The court pointed out that that system rewarded a county for increasing its mill levy and penalized it for decreasing it, and the court held this to be arbitrary and capricious. It can certainly be argued that distributing money within the county on the basis of taxes levied by the taxing agencies has the same effect.
As you can see, there are numerous difficult questions raised by the bill, and we cannot predict with any assurance what the court will say when confronted with them. However, if the last sentence of section 2 is corrected, we believe we would attempt to defend the validity of the first five sections of the bill.
We have not had time to reach any conclusion about the balance of the bill, and, in view of the nonseverability clause of section 18, any invalidity found in other sections would automatically invalidate the first five sections as well.
Very truly yours, PAUL L. DOUGLAS Attorney General Ralph H. Gillan Assistant Attorney General