REQUESTED BY: Senator Calvin F. Carsten Nebraska State Legislature State Capitol Lincoln, Nebraska 68509
Dear Senator Carsten:
You have asked our opinion as to the constitutional validity of the final reading version of LB 284.
The first four sections of this bill create the Political Subdivision Property Tax Relief Fund, provide that seventy million dollars shall be appropriated to it in fiscal years 1980-1981, 1981-1982, 1982-1983, and provide for its distribution to political subdivisions of the state. We have substantial doubts as to the validity of the formula for distribution.
The money in the fund is initially to be distributed to the counties, and then is to be distributed by the counties to the political subdivisions within the counties, including the counties themselves. The percentage of the fund each county is to receive for distribution is obtained by dividing the actual valuation of taxable property in the county by the actual value of taxable property in the state.
As the Supreme Court held in State ex rel. Douglas v.Marsh, 207 Neb. 598 (1980), distributions of this sort to the various counties involve classification, with each county put in a separate class. This does not involve frozen
classification, as was involved in that case, but it is classification. The Legislature may, of course, classify for purposes of legislation, but the classification `must be based on some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified.' See, Cityof Scottsbluff v. Tiemann, 185 Neb. 256, 175 N.W.2d 74
(1970). In order to determine the reasonableness of classification, we must look to the objects and purposes of the law. See, Skag-way Department Stores, Inc. v. City ofGrand Island, 176 Neb. 169, 125 N.W.2d 529 (1964).
The bill does not attempt to state the purpose which will be served by this formula for distribution. Section 6 does mention some purposes of providing financial assistance to the political subdivisions, but it is not clear whether that section pertains to the distributions we have been describing, or only to such assistance after fiscal year 1982-1983. In any event, none of those itemized in section 6 demonstrate a logical relationship between themselves and the distribution of the funds on the basis of valuations of taxable property.
In our opinion of April 1, 1981, Opinion No. 62, we reached the conclusion that we might be able to defend the use for two years of real estate valuations of the type discussed in that opinion, because the purpose of the bill was to replace revenue lost because of the exemption of certain types of agricultural-related personal property and business inventories. We felt that a tenable argument could be made that the use of the valuations as then prescribed might roughly reflect the losses suffered by each county because of such exemptions.
We do not believe LB 284, as amended, can be construed as being reimbursement for revenues lost because of the exemptions we have mentioned. The actual losses are unascertainable, and we can see no possible relationship between such losses and assessed valuations of taxable property.
We have read a publication by the Advisory Commission on Intergovernmental Relations entitled `The State to State-Local Revenue Sharing,' published in December, 1980. This publication states that 49 of the states have some such revenue-sharing program, and it analyzes the formulas used in many of the states. In general these formulas either attempt to compensate taxing agencies for revenues lost because of exemptions, to relieve property tax burdens by returning sales or income tax revenues to the sources from which they originated, or to distribute state revenues to local governmental units on the basis of need. We think the distribution on the basis of assessed valuations, as provided in LB 284, meets none of those goals.
As we have said, the formula does not purport to reimburse taxing agencies for losses due to exemptions, nor does it attempt to allocate the fund on the basis of the source of state revenue. Does it allocate the money to the counties on the basis of the relative needs of the counties? We think not.
In the publication we referred to, assessed valuations were indeed used in some of the formulas, but they were used in the form of assessed valuation per capita, and increased valuation per capita led to less state aid, not more. The reasoning is that increased valuation per capita permits the taxing subdivision to raise the necessary revenues with a lower mill levy, so that the subdivision has less need for state aid. The formulas utilizing assessed valuations have therefore distributed the money on a per capita basis, adjusted by the per capita value of the assessed valuation of taxable property, so that the higher the assessed valuation per capita, the lower the dollar amount per capita disbursed by the state.
Distributing the fund on the straight basis of assessed valuations tends to give more money to those who need it least. Let us take two counties with identical populations, with county A having assessed valuations 50 percent higher than those of county B. The need for expenditures is primarily, although not exclusively, a function of population.See, `The State of State-Local Revenue Sharing,' p. 20. The revenue needs of counties A and B should be roughly the same. County A can raise that revenue with a mill levy only two-thirds that of county B, but under the proposed formula would get 50 percent more state aid. We are confident that among the 93 counties in the state many examples will be found to demonstrate this result. We think it is an irrational result.
It may be argued that there is some relationship between assessed valuations and population, so that the more populous counties will tend to get more money than less populous ones, even though they may get less per capita. This may be true, but it would be hard to justify using this as a substitute for distributing the fund on a population basis, when the actual population figures are available. If we divorce the assessed valuations from population, we are unable to perceive any rational basis for their use in the distribution of state aid.
Our Supreme Court demonstrated in State ex rel.Douglas v. Marsh that it will insist on a rational basis for distribution. It held that a distribution based on increased tax effort of a taxing subdivision was irrational. We think such a distribution was much more defensible than the one we are dealing with, based solely on the values of taxable property.
In our opinion of April 1, 1981, No. 62, we discussed a possible problem with respect to the distribution within the county, but reached the conclusion that we were prepared to defend it. The version of LB 284 we are now discussing has the same provision for distribution within the county. Again, we cannot guarantee what the court would say about it, but we feel that it is defensible.
We are therefore of the opinion that it would be difficult to defend the validity of distributing these funds to the counties in proportion to the value of the taxable property in each county.
Very truly yours, PAUL L. DOUGLAS Attorney General Ralph H. Gillan Assistant Attorney General