REQUESTED BY: Senator Loran Schmit Member of the Legislature 1105 State Capitol Lincoln, Nebraska 68509
Dear Senator Schmit:
In your letter of January 18, 1982, you call our attention to LB 816, and ask us several questions about the validity of Neb.Rev.Stat. §§ 77-27,136 to 77-27,137.01 (Supp. 1980), some of which would be amended by LB 816. Ordinarily we do not render opinions as to the constitutionality of legislation which has already been enacted, but because of the relationship of these sections to LB 816, we must depart from this rule.
LB 816 disposes of an additional 70 million dollars in state aid to schools, technical community colleges, counties and incorporated municipalities, presumably the 70 million dollars which would have been distributed pursuant to Neb.Rev.Stat. § 77-3611 to § 77-3617 (Supp. 1981), which would be repealed by LB 816. Section 1 of the bill allocates an additional 41 million dollars to the School Foundation and Equalization Fund, and Section 2 allocates an additional 2 million dollars for aid to technical community colleges. You have asked no questions about the provisions of Sections 1 and 2 of the bill, so we will not discuss them herein.
Section 3 of the bill amends § 77-27,136 by increasing the aid for governmental subdivisions from $12,600,000 to $39,600,000, an increase of 27 million dollars, the balance of the 70 million dollars we previously referred to. Section 4 amends § 77-27,137 to provide that 16 million dollars of this increase would go to the general funds of the counties. The balance, pursuant to § 77-27,136.01, would go to incorporated municipalities.
LB 816 would not change the formula under which funds are allocated under §§ 77-27,137 and 77-27,137.01, but only the amounts involved. Your questions involve the validity of the formula presently found in those sections.
Section 77-27,137 provides that the portion of the fund to be distributed for deposit in the general funds of the counties shall be allocated to the counties 50 percent on the basis of the ratio of the population of each county to the population of the entire state, and 50 percent on the basis of the ratio of the valuation of real estate in each county to the valuation of real estate in the entire state. We feel that basing a distribution on assessed valuation in the manner described may be subject to successful constitutional attack.
We discussed a very similar provision in LB 284 in Opinion No. 78, dated April 14, 1981, to Senator Carsten. We discussed the question at some length in that opinion, and will not repeat it here. We were unable to find any rational relationship between assessed valuations, as used in LB 284, and the needs or entitlement of a particular county and the political subdivisions contained therein for state aid. We stated that such a method of distribution tended to give the most money to those who needed it least. After the passage of LB 284 we filed an action in the District Court for Lancaster County asking for a determination of the validity of that provision. The District Court has recently held it unconstitutional, and the case will, we understand, be appealed. The final answer to the validity of such provisions will be supplied by the decision in that case. Payments to counties and incorporated municipalities have been made under the formula prescribed by §§ 77-27,137 and 77-27,137.05 since 1969. You ask whether all such payments have been improper or illegal. We cannot give you a categorical answer until the Supreme Court has ruled on the validity of the similar provisions of LB 284, but obviously we believe the statute authorizing such payments to be invalid. The payments were not `improper or illegal' in the sense of implying any wrongdoing on the part of the state officials who made such payments in accordance with statutory directions, but may well be `improper and illegal' because the statute was constitutionally invalid.
You ask whether, if the statutory method of distribution is unconstitutional, the counties and municipalities which have received such funds can be required to refund them to the state. We know of no clear precedent on this question, but we do point out that in State ex rel. Douglasv. Marsh, 207 Neb. 598, 300 N.W.2d 181 (1980) we were challenging another distribution formula. The first distribution under that formula was to be made while the case was pending before the Supreme Court, so we asked for a temporary injunction to prevent any distribution pending a final decision. The court, in granting the temporary injunction, said that in the event the court should hold the distribution of the funds unconstitutional, any that had been distributed would be required to be refunded. While this is not the same as a published opinion of the court so holding, it is a good indication of the court's initial reaction to this situation.
We believe, however, that in no event would refunds back to 1969, the first year distributions were made, be required. Neb.Rev.Stat. § 25-218 (Reissue 1979) provides in part:
 Every claim and demand in behalf of the state, except for revenue, or upon official bonds, or for loans or money belonging to the school funds, or loans of school or other trust funds, or to lands or interest in lands thereto belonging, shall be barred by the same lapse of time as is provided by the law in case of like demands between private parties.
Distributions of state aid to its political subdivisions are not `revenue' to the state, within the exception to § 25-218, so we believe that Neb.Rev.Stat. § 25-212
(Reissue 1979), which provides for a limitation of four years for an action for relief not otherwise provided for applies to this situation.
You ask for our recommendation as to how the Legislature should proceed to assist in resolving the problem of money which has been distributed illegally. We do not believe we should become involved in drafting legislation of this sort. It is, of course, a legislative matter. We will be happy to look over any proposed legislation you wish to introduce, to determine its validity.
Your final question is whether, if we determine that the present 50 percent population, 50 percent valuation formula is valid, a 25 percent population, 75 percent valuation formula would be valid. Since we have not reached that conclusion, it is not necessary to answer that question. We will observe, however, that combining a constitutionally acceptable basis for distribution with a constitutionally unacceptable basis does not cure the defect in the latter basis. On the contrary, the unconstitutional basis probably renders the entire distribution invalid, because the court would probably find that the two provisions were not severable, and that the unconstitutional part was an inducement for the passage of the other, and that both must fall. The severability clause found in Section 5 of LB 816 would probably save Sections 1 and 2 of the bill, since they involve distributions under formulas entirely separate and different from those we have discussed.
Very truly yours,
PAUL L. DOUGLAS Attorney General
Ralph H. Gillan Assistant Attorney General