STATE OF NEBRASKA, APPELLEE, V. ROBERT EDWARD HUNT, JR., APPELLANT.

371 N.W.2d 708

Filed August 9, 1985.   No. 84-797.

Thomas H. DeLay of Mueting, DeLay & Stoffer, for appellant.

Robert M. Spire, Attorney General, and J. Kirk Brown, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

CAPORALE, J.

A jury found defendant, Robert Edward Hunt, Jr., guilty of first degree murder. He was thereupon so adjudged and subsequently sentenced to death. We affirm the adjudication of guilt but vacate the sentence and remand for resentencing.

## THE CRIME AND ITS INVESTIGATION

On the evening of April 12, 1984, at approximately 10:30 p.m., Officers Kenneth Monroe, Douglas Dekker, Rick Brahmer, and Donald Klug of the Norfolk Police Department were dispatched to defendant's Norfolk home. The officers had been advised by their dispatcher that a woman had called stating her husband thought he had killed someone and was "going off the deep end." Upon their arrival at defendant's residence, the officers were met by Wanda Hunt, defendant's wife, who informed them "he is in the other room. He is not

dangerous. He doesn't have any guns or weapons. He is sitting down." The officers found defendant sitting cross-legged on the floor in the living room, sobbing. Officer Dekker, an acquaintance of the defendant, approached him and asked, "Bob, do you remember me?" The defendant leaned over, put one hand on Officer Dekker's arm and one arm around his side, and said, "Yeah, Doug, I killed her. Doug, I killed her." The defendant responded to further questions from Officer Dekker, stating that he did not know the victim's name but gave them the victim's address. Defendant further said, "She works at Norfolk Dodge. Her picture was in the paper because she is getting married next month." Defendant then informed the officers that he gained entrance into the victim's home by brandishing a BB gun he had stolen earlier from a store and that he "strangled her." Defendant then started mumbling, "I gotta pay. I killed her. I gotta pay." Officer Dekker noticed a large scratch on defendant's chest and arm and asked where it came from, to which defendant replied, "She must have did it."

After a moment or two of silence, defendant directed the officers to a cassette box under a couch. Officer Brahmer opened the box and found that it contained several pairs of ladies' underwear, nylon hosiery, sex-oriented magazines, a pair of glasses, and a BB gun. Officer Brahmer asked Mrs. Hunt if the underwear or the glasses belonged to her. She replied that they did not. Defendant then told the officers he thought the glasses belonged to the victim.

Officer Dekker said he thought someone should go to the address mentioned by defendant to check on the welfare of the person there, to which defendant replied that he killed her and that she was dead. Defendant then said, "I can see her. She's in the bathtub and she's dead." At that time Officers Monroe and Klug, who had just arrived at the scene, left defendant's residence and proceeded to the address given by defendant to determine what had taken place there. Officers Dekker and Brahmer stayed with defendant in his home.

Officer Dekker asked defendant if he had done anything else to the victim. Defendant replied, "Yeah, I sexually assaulted her after she was dead. I always see them girls laid out in the pictures with their eyes closed and I just had to do it. I dreamed

about it for so long that I just had to do it."

Defendant, who continued to sit on the floor, rocking and sobbing, said what Officer Dekker thought was "please don't kill me." Officer Dekker further recalled:

> I wasn't real sure if that's what he said. So then I asked him again the question, "What?" in reference to what he said, at which time he said, "Please don't kill me." I then stated to him, "Bob, nobody is going to kill you." He then started sobbing a little harder and said, "No, not me. She said please don't kill me, please don't kill me, and I didn't listen, I did it anyway."

In the meantime, at approximately 10:50 p.m., Officers Monroe and Klug arrived at the victim's home. After receiving no answer to their repeated knocking and calls, the officers entered the residence, a mobile home, and found the victim nude, lying face down in the bathtub. They observed that a nylon material was wrapped around the victim's neck and that some of the same type of material had been placed in her mouth. Officer Klug, after checking for a pulse and finding none, and observing that the victim's skin was very pale and cool to the touch, concluded that the victim was dead. He then notified Officer Dekker, who was still at defendant's house, that defendant's story was apparently true and to arrest him.

Defendant was thereupon arrested and taken to the Norfolk police station by Officers Dekker and Brahmer. While being booked, defendant pulled a crumpled washcloth from his pocket. When asked by Officer Dekker where the cloth came from, defendant replied that he did not know.

Prior to any interrogation after the arrest and before defendant was advised of his *Miranda* rights, defendant inquired whether he could ask Officer Leon Chapman a question, then asked how "the girl" was. Officer Chapman told defendant that she was dead, to which defendant responded by placing his hands over his face, with his elbows on his knees, for approximately 30 seconds. Defendant then sat up, Officer Chapman advised defendant of his *Miranda* rights, and questioning by Officer Chapman began at 12:15 a.m. on April 13. Officer Chapman testified that at this time defendant was calm and did not act shocked or stunned, other than the gesture

with his hands over his face.

Defendant told Officer Chapman that prior to April 12, 1984, he had told his wife that he had an urge to kill a woman and have sex with her after she was dead. He explained that he had experienced these urges in the past. On these other occasions he would gather up the cassette case, together with sex magazines and a large kitchen knife, and go "out looking for a female to do this with, but on those occasions could not find one."

In response to a question about why he picked this particular girl, defendant stated that the Tuesday prior to April 12, 1984, which was a Thursday, he saw a photograph of the victim on the engagement page of the Norfolk Daily News. She was otherwise unknown to him. He further reported that during the early evening hours of April 12, 1984, he shoplifted a BB gun and some women's panties and nylons, having shoplifted some nylon rope on the previous night.

Defendant then drove to the victim's mobile home and parked. He watched the victim's home for 5 to 10 minutes and saw that the lights were on, a car was in the driveway, and that someone was home. The victim had in fact returned home a short time earlier, having eaten dinner with a friend and her husband at their home. She had left her friend's house at approximately 9:10, telling them she was going to the post office and then home.

Defendant then drove down the street and parked in the lot of a nearby store, positioning his car so that he could see the victim's home. He kept the home under observation for another 5 or 10 minutes while he also looked at some of the sex magazines he had brought with him.

Defendant got out of his car, took his cassette case and the gun, which he had stuck into his pants, and walked up to the victim's home. He walked around it approximately two times, looking into the windows to determine if he could see the victim. He could not, and walked up onto the porch and knocked on the door. When the victim opened the door, defendant pointed the gun at her and walked in.

Defendant commanded the victim to lie on the floor in the kitchen. After she complied, he tied her arms and legs with the

nylon rope. The victim said something about "take my car," but she did not have a chance to say too much as he had stuck some panties into her mouth. Defendant then dragged the victim into the living room, where he removed a nylon stocking from his cassette case and put it around her neck, strangling her. According to Officer Chapman, defendant described the process as tightening "down tighter and tighter trying to render her unconscious." When she finally became unconscious, defendant untied the rope and threw it on a living room table.

Defendant then removed the victim's robe and carried her into the bedroom, where he removed his pants and masturbated, ejaculating onto her stomach. Defendant stated that the victim still had a pulse. He next carried the victim into the bathroom and placed her in the bathtub, which had approximately 1 foot of water in it. The victim was twitching and shaking while he placed her head under the water. Then the telephone rang and defendant gathered his belongings and left.

At the end of this interview Officer Chapman asked defendant to give him a tape-recorded statement or a written statement concerning his involvement in the victim's death. Defendant replied that he "would . . . just as soon have an attorney present for any written or tape recorded statement." Officer Chapman then asked defendant if he would agree to let the police search his home and his car. Defendant replied yes, saying that he was willing to cooperate in any way, except that he would like to have an attorney present when and if he gave a written or tape-recorded statement. The interview then ended at approximately 1:53 a.m., April 13, 1984.

At approximately 2:35 a.m. the same morning, defendant signed a consent form giving the police permission to search his home and automobile. Defendant's home and automobile were then searched by members of the Norfolk Police Department. A partial box for a BB gun, a pair of opera glasses and its box, and items not related to the crime were seized from his automobile.

At 9:34 a.m. Officer Chapman began to interrogate defendant a second time. Defendant had not yet consulted with an attorney, nor had he been given an opportunity to do so. Officer Chapman again informed defendant of his *Miranda*

rights, which defendant again waived. During this second interrogation, defendant told Officer Chapman that he had taken a pair of glasses which the victim was wearing when he entered her home. He removed them from her face at the time of the murder because he feared his fingerprints were on them. Defendant admitted that he used rubber gloves and a washcloth taken from the victim's home to wipe his fingerprints off the doorknob and other things he had handled in the apartment. Defendant also admitted that he had oral sex with the victim after rendering her unconscious but that "it didn't give me the kick that I thought it would." Defendant first said that his purpose was to knock the victim unconscious and then engage in sexual activity with her. However, when Officer Chapman asked, "[L]ast night when you went to the victim's house, did you go there with the intent to kill her and have sex with her," defendant replied, "[T]hat was the general idea when I left my house yes." The defendant then said to Officer Chapman, "I think that you and I agreed that before I made any further statement I would have an attorney." Officer Chapman told defendant he understood defendant was willing to cooperate in any way except giving a written or recorded statement, and then asked:

"[D]id you recall it being that way" and he [defendant] then waited for a minute and advised "yes." And that was at approximately 10:45 a.m. on the 13th of April, 1984. After that statement then I then asked him again, quote, do you wish questioning to be ceased now, quote, and Hunt then advised me after about 10 or 15 seconds of just sitting there thinking, he stated, quote, that's fine, might as well keep going, quote.

The questioning ended at 10:46 a.m.

After defendant was arrested, Mrs. Hunt disclosed to police, both orally and in writing, that a few months prior to the crime defendant had told her that he fantasized about murdering a woman and then masturbating on her.

An autopsy was performed on the victim's body at approximately 9:30 on the morning of April 13, 1984, by Dr. Harlan Papenfuss, who died prior to trial. Clyde Cassel, Jr., Dr. Papenfuss' assistant, testified by deposition that the victim's

mouth was found to contain two pairs of women's panties, which were removed during the autopsy. The second pair of panties was impacted tightly into the back of the victim's mouth, almost into the throat, and had to be removed with the aid of forceps. Cassel testified that when pushed up into that area, the panties obstructed the nasal passages.

A leg from a pair of nylon stockings had been tied around the victim's neck. After comparing the portion of a pair of nylon stockings found by the police in defendant's cassette box and the portion found around the victim's neck, a forensic chemist testified that in his opinion the two portions had at one time formed a single pair of nylon stockings.

Dr. Steffen Lacey, a pathologist, testified that he had reviewed Dr. Papenfuss' autopsy report, the photographs taken at the time of the autopsy, and the testimony of Clyde Cassel, Jr., and that in his opinion the victim died of asphyxia as a result of ligature strangulation. That is to say, the victim died from a lack of oxygen resulting from some object having been placed around her neck which prevented her from breathing. It appeared to Dr. Lacey that the nylon stocking was used to accomplish the strangulation. The victim's neck showed three bruises running around its circumference in three different positions, indicating the nylon stocking had been moved from point to point on the victim's neck, then tightened. Dr. Lacey also testified that the ligature pressure exerted on the neck in this manner could cause unconsciousness for a brief period prior to death and that in a death caused by lack of oxygen to the brain, the body may twitch or shudder either at the time of death or after death. In Dr. Lacey's opinion death occurred from zero to 24 hours prior to the autopsy.

Carol Zastera, a forensic serologist, testified that no semen was found on the victim's body or on the swabs taken from her body tissue and that it was possible that the body could have been cleansed of the semen by water prior to the autopsy.

## PRETRIAL MOTIONS

Prior to trial, defendant moved to suppress any evidence relating to the items seized from his automobile and home and to suppress all statements made by him after he was placed in

custody by the Norfolk Police Department. In addition, defendant moved that all evidence concerning communications between him and his wife be suppressed and that the State be directed not to adduce any evidence which in any manner referred to such communications. The trial court overruled all the motions except that it suppressed defendant's denial of knowledge as to the source of the washcloth found on his person.

## ISSUES RE ADJUDICATION OF GUILT

Defendant's 23 assignments of error present the following 5 issues with respect to the determination that he is guilty of first degree murder: (1) Whether the trial court erred in failing to sustain defendant's motion to dismiss following the prosecutor's opening statement; (2) Whether the trial court erred in failing to suppress and exclude evidence of the admissions made by defendant to the police after he was arrested; (3) Whether the trial court erred in finding that elimination of the spousal privilege in violent crimes is constitutional; (4) Whether the trial court erred in failing to suppress evidence concerning the items seized from defendant's home and automobile; and (5) Whether the trial court erred in finding that the evidence was sufficient beyond a reasonable doubt to find the defendant guilty of first degree murder.

We address each of these issues in turn.

### (1) Statement of Prosecutor

Defendant contends that the trial court erred in overruling his motion to dismiss the information following the prosecutor's opening statement. He argues that Neb. Rev. Stat. § 29-2016 (Reissue 1979) mandates that the prosecutor define in the State's opening statement the elements of the crime with which a criminal defendant is charged and that the prosecutor in this case failed to so do. Assuming, without deciding, that the elements of first degree murder were not delineated during the State's opening statement, the defendant's contention is nonetheless without merit.

Section 29-2016 provides in part:

After the jury has been impaneled and sworn, the trial shall proceed in the following order: (1) The counsel for

the state must state the case of the prosecution and may briefly state the evidence by which he expects to sustain it; (2) the defendant or his counsel must then state his defense and may briefly state the evidence he expects to offer in support of it . . . .

The statute requires the prosecution to "state the case"; it does not, contrary to the defendant's contention, specifically require that the prosecution define the elements of the crime. We so held in *State v. Oltjenbruns*, 187 Neb. 694, 701, 193 N.W.2d 744, 749 (1972), saying: "The statute requires that counsel for the state *must* state the case of the prosecution and may briefly state the evidence by which he expects to sustain it. It contains no requirement that the prosecution must specifically enumerate all of the necessary elements of the offense."

Defendant argues that *Oltjenbruns* is distinguishable because in that case the prosecutor failed to mention some of the elements, whereas in his trial the prosecutor did not mention any of the elements. We do not find this distinction at all meaningful. The prosecution "stated the case" when it outlined the nature of the proceeding against the defendant. It further outlined for the jury the evidence which would disclose how the murder occurred. See, also, *Morris v. State*, 109 Neb. 412, 191 N.W. 717 (1922).

### (2) Admissions of Defendant

The second issue, as argued by the defendant, presents two questions: (1) Should the admissions made by defendant during the second April 13 interview beginning at 9:34 a.m. have been suppressed? (2) Should defendant's admission of past searches for women to kill in order that he might satisfy his sexual urges have been suppressed?

### Second Interview

The first of these two questions must be answered negatively. At trial the prosecutor wisely refrained from introducing into evidence any of the admissions defendant made during the constitutionally suspect second interview. Thus, the trial court's ruling refusing to suppress those admissions had no effect on the resolution of the issue of defendant's guilt. If there was error

in the ruling, the error did not result in prejudice and was therefore harmless. Harmless error provides no ground for the reversal of a judgment of guilt. *State v. Smith*, 218 Neb. 201, 352 N.W.2d 620 (1984); *State v. Plymate*, 216 Neb. 722, 345 N.W.2d 327 (1984).

## Prior Acts

The second question is whether evidence as to defendant's admissions of his prior unsuccessful efforts to satisfy his urges to kill women and sexually use their corpses should have been excluded. Defendant argues that evidence of other acts may not be received in a criminal prosecution unless that evidence is so related in time, place, and circumstance to the offense charged as to have probative value. Defendant asserts that the evidence admitted at trial was too far removed in time from the murder and that the events were not similar enough to the crime in question as to justify its admission. Defendant also complains that the evidence was unduly prejudicial.

Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 1984) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This court explained the function of § 27-404(2) in *State v. Stewart*, 219 Neb. 347, 351, 363 N.W.2d 368, 371 (1985), as an

> inclusionary rule permitting the use of relevant, specific acts for all purposes except to prove character of a person in order to show that such person acted in conformity with character. Thus, Rule 404(2) permits evidence of other acts if such acts are relevant for any purpose other than to show a defendant's propensity or disposition to commit the crime charged.

However, § 27-404(2) is subject to the overriding protection of Neb. Rev. Stat. § 27-403 (Reissue 1979), which states that such evidence must be excluded if, among other things, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Craig*,

219 Neb. 70, 361 N.W.2d 206 (1985). Further,

> Evidence of other crimes may be admitted in a criminal prosecution where the evidence is so related in time, place, and circumstances to the offense or offenses charged so as to have substantial probative value in determining the guilt of the accused. The balancing of the need for other-crimes evidence against the possible prejudice to the defendant is within the appropriate discretion of the trial court.

*State v. Keithley*, 218 Neb. 707, 710, 358 N.W.2d 761, 764 (1984). In discussing the discretion exercised by the trial court in admitting such evidence, we said:

> "The extent to which the discretion of the trial court will be allowed to be exercised in this regard has not been fixed by any decision of this court. Probably it cannot be but depends upon the facts in each case. . . . In State v. Siddoway, 61 Utah 189, 211 P. 968, it was held: 'No exact limitation of time can be fixed as to when another offense tending to prove the intent of the act charged is remote. The decision of that question must depend upon the circumstances of the particular case, and whether evidence is too remote or not is a question whose decision is largely in the sound discretion of the trial court.' [Citations omitted.] The doctrine generally accepted is that remoteness in point of time may weaken the evidential value of the evidence but does not justify its exclusion. [Citations omitted.]
>
> "*Likewise it is a matter left to the discretion of the trial court as to whether the prior offenses are sufficiently similar to the one charged in the case on trial so that evidence thereof has probative value.*"

(Emphasis in original.) *Id.* at 709-10, 358 N.W.2d at 763, quoting *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981).

With these principles in mind we turn to the facts of the present case.

Defendant had lived in Norfolk for 6 years. Officer Chapman testified at trial, as indicated earlier, that during the first interview on April 13, 1984, defendant admitted to him that he had experienced past urges to kill a woman and have sex

with her and that he had talked with his wife about it. Defendant then told Officer Chapman that on two or three occasions prior to the murder, he had gathered his cassette case together with the paraphernalia, that being the sex magazines and a knife that he had gotten from the kitchen at his residence, and then went out looking for a female to do this with, but on those occasions could not find one.

This evidence is relevant to prove defendant's intent, which is the state of mind operative at the time of an act. *State v. Stewart, supra.* The evidence was not offered to show defendant's character and that he acted in accordance with it. Rather, the evidence tended to show that defendant went to the victim's home intending to kill her and then to have sex with her. The acts are strikingly similar in nature to the actual crime defendant eventually committed. The evidence is relevant in that it tends to refute defendant's claim that he did not premeditate the murder—that he meant only to render the victim unconscious. The prior acts also tend to prove defendant's motive, preparation, and plan in the present crime.

We therefore cannot say the trial court abused its discretion in admitting this evidence at trial.

### (3) Spousal Privilege

Defendant contends that the trial court erred in concluding that abolition of the privilege preventing a spouse from testifying about any confidential communication made by one to the other in crimes of violence is constitutional. Neb. Rev. Stat. § 27-505 (Cum. Supp. 1984). He urges that preserving the privilege in nonviolent crimes and abolishing it in violent ones constitutes special class legislation in violation of Neb. Const. art. III, § 18, prohibiting special laws and the granting of a special privilege to any person, and further offends the concepts of due process and equal protection because the classifications of "violent" and "nonviolent" crimes are arbitrary, capricious, and bear no rational relation to a legitimate state purpose.

### Wife's Statements to Police

Defendant first argues that the trial court erred in overruling his motion to suppress and prohibit any reference to the

statements he made to his wife concerning his sexual fantasies. This claim presents no issue because the prosecution offered no trial evidence and made no trial reference to what defendant's wife reported in that respect. As discussed earlier in connection with the second interview, even if the trial court's ruling were erroneous, a matter we do not decide, it had no prejudicial effect upon the defendant and thus provides no basis for reversal.

### Defendant's Statements to Wife

Officer Chapman testified at trial that defendant admitted he had told his wife of having an urge to kill a woman and have sex with her "after she was dead."

For the purpose of analyzing defendant's contentions as to the constitutionality of § 27-505, we assume, but again do not decide, that any spousal privilege which may otherwise have existed was not waived by the combined disclosures made by both defendant and his wife to Officer Chapman.

Each of defendant's constitutional arguments depends upon the premise that treating violent crimes differently than nonviolent ones is unreasonable, arbitrary, capricious, and irrational. Such is simply not the fact.

We stated in *Sandberg v. State*, 188 Neb. 335, 338, 196 N.W.2d 501, 504 (1972), quoting *Gossman v. State Employees Retirement System*, 177 Neb. 326, 129 N.W.2d 97 (1964):

"The principles to be applied to testing legislative classification have been well established. The difficulty arises in their application to a particular set of facts or a particular legislative act. Classification is proper if the special class has some reasonable distinction from other subjects of a like general character, which distinction bears some reasonable relation to the legitimate objectives and purposes of the legislation. The Legislature may, and many times must, carve out classes or distinctions that would appear arbitrary or unreasonable. But, on closer examination, it is found that the classifications are related to and are necessary for the accomplishment of the legitimate purposes of the legislation. The question is always whether the things or persons classified by the Act

form by themselves a proper and legitimate class with reference to the purposes of the Act. . . .'"

In *State ex rel. Douglas v. Marsh*, 207 Neb. 598, 608-09, 300 N.W.2d 181, 187 (1980), quoting *City of Scottsbluff v. Tiemann*, 185 Neb. 256, 175 N.W.2d 74 (1970), we said:

"It is competent for the Legislature to classify objects of legislation and if the classification is reasonable and not arbitrary, it is a legitimate exercise of legislative power. [Citation omitted.] The classification must rest upon real differences in situation and circumstances surrounding members of the class relative to the subject of the legislation which renders appropriate its enactment. [Citations omitted.] The power of classification rests with the Legislature and cannot be interfered with by the courts unless it is clearly apparent that the Legislature has by artificial and baseless classification attempted to evade and violate provisions of the Constitution prohibiting local and special legislation. [Citation omitted.] A legislative classification, in order to be valid, must be based upon some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to the objects to be classified. *Classifications for the purpose of legislation must be real and not illusive; they cannot be based on distinctions without a substantial difference.* [Citations omitted.]" (Emphasis in original.)

The legislative history of the amended version of § 27-505 makes it clear that the purpose of the statute is to deny the spousal privilege to those accused of violent crimes, just as it had previously been denied, and continues to be denied, to those accused of bigamy, incest, or other interspousal offenses. Floor Debate, L.B. 696, Judiciary Committee, 88th Leg., 2d Sess. (Feb. 10, 1984). The Legislature intended to strike a balance between the societal interests in the sanctity of the marital relationship and the need of society to protect itself from and to prosecute violent crime. Floor Debate, *supra*.

As we stated in *State v. Ruzicka*, 218 Neb. 594, 597, 357 N.W.2d 457, 461 (1984):

This court does not sit as a superlegislature to review the wisdom of legislative acts. . . .

It is well established that all reasonable intendments must be indulged to support the constitutionality of legislative acts, including classifications adopted by the Legislature. If the classification of persons singled out by the legislation is reasonable and not arbitrary, and is based on substantial differences having a reasonable relation to the persons dealt with and the public purpose to be achieved, it meets the constitutional test of equal protection.

The classification of persons who commit violent crimes is based on a substantial difference from the rest of the population and is reasonably related to the purpose of the statute, which is to enable better prosecution of violent·crimes and to thereby better protect society. The legislation is not special legislation and grants no special privilege, nor does it offend the concept of due process or equal protection of the law.

### (4) Seizure of Items

Defendant argues that the consents he gave for searches of his home and automobile were constitutionally invalid because he had earlier expressed the desire to have an attorney present before giving a written or taped statement. Once again, we assume for the purpose of this analysis, but do not decide, that defendant's claim in this regard is correct.

We need spend no thought on the search of the house, for although some items were seized as a result of that search, they had nothing to do with this crime, and no reference to them was made at the trial.

The partial box for the BB gun and the opera glasses seized from the automobile were received in evidence. The opera glasses were not otherwise mentioned in the testimony. Even if the jury were to speculate that those were the glasses defendant used to observe the victim's home, the fact that he had watched her home before entering it was in evidence through the testimony of Officer Chapman. He testified that defendant told him he had watched the victim's home. The opera glasses,

therefore, were merely cumulative evidence.

The same is true of the partial box. There is no dispute but that the BB gun used by the defendant to gain entrance into the victim's home was properly received in evidence. Admission into evidence of part of the box in which the BB gun had been packaged added nothing of significance to the chain of evidence implicating the defendant in the victim's murder.

We have held that if properly admitted evidence exists to establish that which improperly admitted evidence also establishes, the error in receiving the inadmissible evidence is not a ground for reversal. *State v. Fix*, 219 Neb. 674, 365 N.W.2d 471 (1985).

Therefore, even if the opera glasses and partial box should not have been received in evidence, there was no prejudice which resulted from the error.

### (5) Sufficiency of the Evidence

It has long been the rule in this state that in determining the sufficiency of the evidence to sustain a conviction, it is not the province of this court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Such matters are for the trier of fact. The verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Lichti*, 219 Neb. 894, 367 N.W.2d 138 (1985); *State v. Stewart*, 219 Neb. 347, 363 N.W.2d 368 (1985); *State v. Morse*, 211 Neb. 448, 318 N.W.2d 893 (1982).

The evidence establishes beyond a reasonable doubt that the victim died of strangulation at defendant's hands. The evidence further is such that the jury could find that defendant thought about the killing over a period of months, that he stole equipment over a period of 2 days with which to perform the act, that he sought out the victim with the intention of killing her, and that he took the victim's life to satisfy a perverted sexual urge.

A person commits murder in the first degree if he, among other things, kills another person purposely and with deliberate and premeditated malice. Neb. Rev. Stat. § 28-303 (Reissue 1979). The evidence supports a finding that defendant did just

that.

## THE SENTENCE

A sentencing panel was convened in accordance with the provisions of Neb. Rev. Stat. § 29-2520 (Reissue 1979), which first determined that defendant is an untreatable mentally disordered sex offender. Neb. Rev. Stat. §§ 29-2911 and 29-2914 (Reissue 1979). After conducting a second hearing the panel sentenced defendant to death.

The Legislature has ordained that imposition of the death penalty be limited to the crime of murder in the first degree, and then only if the aggravating circumstances set forth in Neb. Rev. Stat. § 29-2523 (Reissue 1979) outweigh the mitigating circumstances set forth therein. Neb. Rev. Stat. §§ 28-303 and 29-2519 (Reissue 1979).

The sentencing panel in this case found two of the aggravating circumstances delineated in § 29-2523 to exist, namely, aggravating circumstances (1)(b) and (d), which are set forth in the discussion which follows.

Defendant assigns a number of errors to the manner in which the sentencing hearing was conducted, to the findings of the panel, and to the sentence imposed, claiming it to be both excessive and disproportionate. Among his various claims is the specific assignment of error that the evidence does not support the existence of either aggravating circumstance (1)(b) or (1)(d). Defendant concludes by arguing that since no aggravating circumstance exists, the maximum sentence which can be imposed upon him is life imprisonment, the only remaining authorized sentence. Neb. Rev. Stat. §§ 28-105 and 28-303 (Reissue 1979).

Our analysis reveals that defendant's contention with respect to the absence of aggravating circumstances is correct. Since that determination makes the death sentence inappropriate under existing law, we need not, and therefore do not, consider the other errors he assigns to the sentencing hearing and to the sentence itself.

The verdict that defendant is guilty of first degree murder must of necessity rest upon a finding that he killed purposely and with deliberate and premeditated malice. In order to so find

under the evidence in this case, the jury first had to find that defendant went to the victim's home with the intention of killing her so that he could play out his sexual fantasy with a female corpse. Such a finding is inconsistent with the existence of aggravating circumstance (1)(b), which is defined in § 29-2523 as: "The murder was committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of a crime." There is no question but that the murder was not committed for the purpose of concealing the commission of a crime. Nor does the evidence establish that it was committed for the purpose of concealing defendant's identity. Certainly, any killing has the effect of rendering the victim incapable of identifying the perpetrator; that truism, however, does not satisfy the requirement that the murder be committed "to conceal the identity of the perpetrator." See, *State v. Williams*, 217 Neb. 539, 352 N.W.2d 538 (1984); *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984). The purpose of the killing in this case was to fulfill a sexual desire.

The evidence establishes that the victim was rendered unconscious within a short time of defendant's intrusion into her home. It therefore cannot be said that the murder was of the nature described in aggravating circumstance (1)(d), as specified in § 29-2523: "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence."

To be sure, forcing items into the victim's throat and the strangulation itself were cruel, but not "especially so," for any forcible killing entails some violence toward the victim. There is no evidence the acts were performed for the satisfaction of inflicting either mental or physical pain or that pain existed for any prolonged period of time.

In order for aggravating circumstance (1)(d) to be present, the method of killing must entail something more than the ordinary circumstances which attend any death-dealing violence. See *State v. Reeves, supra*, wherein aggravating circumstance (1)(d) was held not to be present where a murder was achieved "swiftly and suddenly," but was held to be present in another murder in which the victim, who "did not die quickly," was subjected to sexual penetration while conscious

and defending herself. 216 Neb. at 227, 344 N.W.2d at 447. In contrast, the sexual acts in the present case, as noted earlier, were practiced either on a woman who was unconscious or in whom life had ceased to exist.

Although the method by which defendant achieved sexual gratification may be accurately described as exceptionally heinous and atrocious, and as manifesting exceptional depravity by ordinary standards of morality and intelligence, the murder itself, given the inherent nature of a killing, cannot.

## DECISION

Since no aggravating circumstance as defined in § 29-2523 exists, the sentence of death must be, and hereby is, set aside and vacated. The cause is remanded for resentencing in accordance with law.

SENTENCE VACATED AND CAUSE
REMANDED FOR RESENTENCING.

BOSLAUGH, J., dissenting in part.

I dissent only from that part of the opinion of the court which finds that the record does not support the finding of the sentencing panel that two aggravating circumstances existed.

The sentencing panel found as follows:

(b) "The murder was committed in an apparent effort to conceal the commission of a crime or to conceal the identity of the perpetrator of a crime."

The evidence does establish beyond a reasonable doubt that the murder of Beverly K. Ramspott was committed to avoid detection and apprehension and was committed in an apparent effort to conceal the identity of the perpetrator of a crime, to-wit: Robert Edward Hunt, Jr. In this regard, the evidence establishes beyond a reasonable doubt that the defendant Robert Edward Hunt, Jr. obtained through theft a rope, nylon stockings, ladies [sic] panties, and a pellet gun in preparation for his assault of the victim. The only logical conclusion for the theft of these items is that they were stolen by the defendant to avoid the possibility that they might later be traced to the defendant. The defendant then went to the home of Beverly K. Ramspott, gained admission and

rendered his victim helpless and unconscious. The defendant then disrobed his victim, masturbated and ejaculated on her body and then checked her pulse for signs of life. The defendant, after finding a pulse, placed his victim face down in the bathtub partially filled with water. Death was caused by strangulation. The defendant then wiped the premises free of fingerprints, removed the victims [sic] eyeglasses to avoid fingerprint detection, gathered up his remaining paraphernalia and fled. The only conclusion that can logically be reached is that Beverly K. Ramspott was murdered to conceal the identity of the defendant, the perpetrator of the assault upon Beverly K. Ramspott. The evidence establishes this beyond a reasonable doubt.

Therefore, this aggravating circumstance does exist.

. . . .

(d) "The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence."

The evidence establishes beyond a reasonable doubt that defendant's purpose in going to the place where Beverly K. Ramspott resided was to have sexual relations with Beverly K. Ramspott. That the defendant was determined to have sexual relations with Beverly K. Ramspott regardless of what he had to do, is proved beyond a reasonable doubt.

Robert Edward Hunt, Jr. picked his victim at random from an engagement announcement contained in the local newspaper. He then put together the items he deemed necessary to carry out his plan, to-wit: The rope, nylon stockings, panties, magazines, and a pellet gun. The defendant then drove to the vicinity of the victim's home, placed the premises under surveillance for a period of time, and then gained entry by the use of the pellet gun. Upon entering the mobile home, the defendant bound the victim and after hearing her plea of "Please don't kill me" forced two ladies [sic] panties into the mouth and throat and then proceeded to strangle the victim with a nylon stocking in such a manner so as to leave three bruised areas

around the neck of Beverly K. Ramspott, moved her from the living room to the bedroom, determined that she was still alive by taking her pulse, and then placed her unconscious body face down in a bathtub containing water. The defendant then left Beverly K. Ramspott to die. All of the above was proved beyond a reasonable doubt. That Beverly K. Ramspott had physical suffering is inferrable [sic] beyond a reasonable doubt from the evidence of the strangulation method used by the defendant.

That defendant killed Beverly K. *Ramspott* is indisputable and conclusive.

The facts above summarized and as more fully set forth in the evidence prove beyond a reasonable doubt that defendant was determined to have sexual satisfaction for his own pleasure from a woman selected at random, that he had with him an instrument of death to assist him in carrying out that purpose; that he did make an assault upon Beverly K. Ramspott and that he strangled Beverly K. Ramspott to carry out that purpose. Beverly K. Ramspott died as a result thereof.

The Supreme Court in State v. Rust, 197 Neb. 528, and subsequent cases approved a statement that "all first degree murder crimes are capable of being accurately characterized by one or more of the descriptive adjectives employed (in 1d) but by the use of the words 'specially' and 'exceptional' the Legislature has required a much greater degree of these characteristics than is usually present in a murder. This category of aggravating circumstances would include murders involving...sexual abuse or the imposition of extreme suffering." The defendant sexually abused Beverly K. *Ramspott* during the course of strangulation. See State v. Perry, 199 Neb. 656, State v. Simants, 179 Neb. 549, and State v. Williams, 205 Neb. 56. The murder of Beverly K. Ramspott was callous, cold-blooded and involved cruel disregard for human life.

The three-judge sentencing panel in State v. Williams, supra, found that Williams killed two women, one of

whom was attempting to escape. The sentencing panel imposed the death penalty in regard to the murders of each of the women finding that aggravating circumstance 1d did apply to each murder. The Supreme Court affirmed.

Here the defendant strangled Beverly K. Ramspott, rendered her defenseless, sexually abused her and left her to die from strangulation.

This murder displays a callous, cold-blooded and cruel disregard for human life. This murder also manifests a shocking display of maliciousness and ruthlessness in that the victim was selected at random and hunted down. The murder of Beverly K. Ramspott manifested exceptional depravity by ordinary standards of morality and intelligence. The acts of killing this defenseless woman, Beverly K. Ramspott was totally and senselessly bereft of any regard for human life.

This aggravating circumstance does exist.

There is conflicting evidence in the record in regard to both of these matters, but in my opinion the record sustains the findings of the sentencing panel beyond a reasonable doubt.

The defendant went to great pains in an effort to avoid leaving evidence at the scene of the crime, such as fingerprints, which would identify him. His fantasy did not require that the victim be dead at the time of his sex act; it was only necessary that she be helpless and subject to whatever he wished to do. The psychiatrist who examined the defendant at the request of defense counsel stated in his report as follows:

There is considerable ritualistic quality to the planning of the assaultive episode, with evidence of the defendant's expectation that certain fantasies would be fulfilled. These apparently had to do with the subduing and controlling of a female, who would then be forced to accede to his needs without being able to leave him. I am aware of no specific evidence, and there is no psychiatric evidence, to indicate that Mr. Hunt intended to kill his victim, although he did not show significant concern for the danger in which he obviously placed her.

At the sentencing hearing this witness testified as follows:

Q. Doctor, to clarify the last question of Mr. Smith's for

a minute. From your examination you were aware and did come to some conclusion about an intent of Mr. Hunt to either kill or render unconscious or control Beverly Ramspott as it occurred immediately prior to the events in question, are you not?

A. Yes.

Q. Did you find that he had an — Did you find, Doctor, or do you have an opinion as to whether or not he went into that home with the intent to kill or intent to render unconscious and to incapacitate Beverly Ramspott?

A. Yes, I do.

Q. What was your finding in that regard?

A. My opinion is that he was far more interested in control, rendering unconscious, incapacitating, and not very interested, if at all, in killing an individual.

. . . .

Q. Doctor, your statement about the defendant's primary interest in controlling his victim, rendering her unconscious and lack of interest in killing her, just so I understand, are you saying whether or not he killed her was unimportant to him? Secondary?

A. I believe it was secondary. I don't believe he cared very much at the time while the act was going on. But, I don't believe — I have no reason to believe that he was consciously trying to kill her at the time.

There is evidence which will support a finding beyond a reasonable doubt that the defendant inserted the gag in the victim's mouth to silence her; that he strangled her until she became unconscious; and that he thought she was still alive until sometime shortly before he placed her face down in the tub partially filled with water. If the victim died as a result of panties being forced almost into her throat, instead of drowning in the tub, that was not the cause of death intended by the defendant.

If this murder did not manifest exceptional depravity by ordinary standards of morality and intelligence, I am at a loss to imagine what type of a killing would conform to the statutory description.

I would affirm the judgment of the district court in all

respects.

SHANAHAN and GRANT, JJ., join in this dissent.