No. 67,260

STATE OF KANSAS, *Appellee,* v. ALAN W. KINGSLEY, *Appellant.*
(851 P.2d 370)

Opinion filed
April 16, 1993.

*Steven R. Zinn,* deputy appellate defender, argued the cause, and *Wendy L. Rhyne Slayton,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, were on the brief for appellant.

*Debra S. Byrd,* assistant district attorney, argued the cause, and *Rachelle Worrall Smith,* assistant district attorney, *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Alan W. Kingsley appeals from his jury convictions of first-degree murder, K.S.A. 1992 Supp. 21-3401(a); aggravated robbery, K.S.A. 21-3427; aggravated arson, K.S.A. 21-3719; and forgery, K.S.A. 21-3710(b). He was sentenced to life without parole for 40 years, 15 years to life, 15 years to life, and 1 to 5 years, respectively. The life sentence is to run consecutively to one term of 15 years to life. The other term of 15 years to life is to run concurrently with the 1-to-5-year term, and the concurrent terms are to run consecutively to the others.

The State's theory of the murder was that Kingsley needed money to leave Wichita. He gained entry into Donna Baker's house on the pretense of paying the next month's rent. He knocked her unconscious, stabbed her five times in the chest, took her into the bedroom, and slit her throat. He took valuable items from the house, set fire to a pile of clothes in the bedroom, closed the bedroom door, and left the house.

The State's evidence showed the following: Kingsley and his wife Sherri had moved from Florida to Kansas "around Easter time." Easter was March 31, 1991. The move was prompted by outstanding warrants for both of them in Florida. They arrived in Leon, Kansas, on the Tuesday after Easter, April 2, and stayed with Kingsley's grandmother.

Donna Baker owned some apartments in Wichita. On April 7 she leased an apartment to the Kingsleys. Alan Kingsley used the name Duane Kingsley in the lease.

For a few days Kingsley tried to sell ersatz designer perfumes door to door. Then on Friday, April 19, Kingsley got a job at

an automobile detail shop. There he used the name Duane Maxwell.

While Kingsley was at work on Monday, April 22, Sherri received a telephone call from a Butler County law enforcement officer who asked about Kingsley's whereabouts, birthdate, and social security number. Sherri contacted Kingsley at the detail shop, and he returned to the apartment about mid-morning.

During that day, in preparation for leaving Wichita, they checked rental prices for U-Haul trucks. They went to several pawn shops but could not get as much money as they wanted for their items. They bought a BB gun that looked like a real gun, which Kingsley intended to use for robbing convenience stores.

About 3:30 p.m. they returned to the apartment, and Kingsley called Donna Baker. Sherri overheard him speak about making arrangements to visit Baker that evening or the next day to pay the next month's rent. Kingsley called his grandparents in Elgin, Kansas, to see if he could pick up the title to his motorcycle. They drove to Elgin, approximately two hours from Wichita, stayed about 30 minutes, and returned.

When Sherri fell asleep that night, Kingsley was still up. She awakened at about 2:00 or 3:00 a.m. Kingsley came into the bedroom wearing a cap and jacket and placed wallets, checkbooks, and jewelry on the bed. Sherri testified that Kingsley told her that he had just killed and robbed Donna Baker.

Later that morning, April 23, Kingsley went to the detail shop to get his check for the work he had done. That afternoon Kingsley and a woman cashed a $500 check made payable to Sherri Olin on the account of Donna Baker. Sherri's maiden name was Olin, and her identification still bore that name. A handwriting expert testified that Sherri endorsed the check but did not write on the face of the check.

Also on April 23, Donna Baker's sister went to Baker's house and saw that the bedroom window was black with soot. Upon entering the house she saw blood and broken items on the floor. She summoned the police.

The first police officer to arrive smelled smoke immediately upon entering the house. He saw blood and other signs of a struggle.

One of the bedroom doors was closed; it was smoke-smudged across the top and down one side. The door was warm to the officer's touch. He pushed it open, and smoke billowed out. What appeared to have been clothing smoldered on a cabinet, and the nearby television was smoldering. As the smoke cleared, he saw Donna Baker's body.

A forensic pathologist testified that various injuries to Donna Baker's hands, face, and head were consistent with her putting up a fight and being hit on the head. She had been stabbed five times in the chest. Any or all of the stab wounds could have caused her death. He believed that she had been stabbed while she was lying down in the living room. In addition, her throat had been cut, and he believed that her throat wound was inflicted in the bedroom either as she was dying or after she was dead.

The fire in the bedroom had been intentionally set. The fire burned primarily in a pile of clothing on a desk in the bedroom. The oxygen supply to the fire was limited by the bedroom door being closed, and the fire smoldered in place instead of spreading to the rest of the house.

Kingsley testified that he and Sherri went to Donna Baker's house together. They intended to knock her out, tie her up, and take her money. Once they were in the house, Kingsley hit Donna Baker on the head with a wine cooler until she was unconscious. Then he went to the bathroom. When he came out of the bathroom 10 or 15 minutes later, he saw Sherri kneeling over Donna Baker with a knife in her hand. There was blood on Donna Baker's throat. Sherri tried unsuccessfully to drag the body; Kingsley picked the body up by the shoulders and dragged it into the bedroom. Then the couple picked through Donna Baker's belongings.

Kingsley first claims that the district court erred in failing to appoint counsel other than trial counsel to represent him at the hearing on his untimely pro se motion for new trial, which alleged ineffective assistance of counsel. Kingsley's trial was completed on August 27, 1991; the verdict was filed on September 4. On September 6 trial counsel filed a motion for new trial on Kingsley's behalf. On October 8 Kingsley filed a pro se pleading entitled, "Motion for New Trial," in which he complained of trial counsel's ineffective representation.

On appeal Kingsley does not argue that his trial counsel was ineffective. Instead, he argues that the district court should have appointed other counsel to represent him at the hearing on his pro se motion. He relies on *State v. Andrews,* 228 Kan. 368, 614 P.2d 447 (1980).

K.S.A. 22-3501 governs motions for new trial in criminal cases. If the basis for the request for new trial is newly discovered evidence, it must be made within two years of judgment. "A motion for a new trial based on any other grounds shall be made within 10 days after the verdict." With regard to entitlement to counsel on a motion for new trial, this court has stated:

"The customary motion for a new trial which must be filed within ten days under K.S.A. 22-3501 and which is principally for the purpose of calling to the attention of the trial court alleged trial errors is a stage of the criminal proceedings within the purview of K.S.A. 1979 Supp. 22-4503, and counsel must be provided to an indigent defendant for the purposes of such a motion." *State v. Andrews,* 228 Kan. 368, Syl. ¶ 3.

A timely motion for new trial was filed on Kingsley's behalf by trial counsel. Kingsley's pro se motion alleged that trial counsel failed to call witnesses on his behalf and had been bribed by Sherri's parents. It was not based on newly discovered evidence, and it was not filed within the 10-day period allowed for motions for new trial.

Kingsley asserts that, despite the apparent conflict, trial counsel represented him at the hearing on his pro se motion. The record does not support his assertion. On October 9, 1991, the district court first heard arguments on Kingsley's motion for new trial and then on his pro se motion. Before taking up the pro se motion, the court noted that the motion contained complaints against trial counsel and asked whether she wished to be heard on the motion. Trial counsel stated that she would continue to represent Kingsley but deferred to him to argue his pro se motion. The court asked Kingsley whether that was the way he wished to proceed, and he answered that it was. Kingsley then made a fairly lengthy presentation to the court and even rebutted the State's argument.

Kingsley's argument consisted primarily of grievances against trial counsel. On appeal, he contends that it was trial counsel's

duty to request permission to withdraw because his success on the motion would have been her downfall.

The State suggests that Kingsley's pro se motion is "more properly viewed as a post conviction motion." In *Andrews,* which involved successive post-conviction motions based on newly discovered evidence, the court found no statutory requirement that counsel be appointed on each post-trial motion. 228 Kan. at 377. The court also concluded that there was no federal constitutional requirement for appointment of counsel at every post-trial proceeding. See 228 Kan. at 377. The court held, therefore, that it was a matter within the sound discretion of the district court. 228 Kan. at 378.

The State further argues that Kingsley was not entitled to appointment of counsel on his motion because there were no "substantial issues" raised. The State argues that Kingsley claimed trial counsel should have called witnesses who were, at best, of questionable value and that she should have pushed for the use and admission of polygraph tests, sodium pentothal, and hypnosis. According to the State, these would have been meritless measures. The State further argues that Kingsley's claims are groundless. For example, based on his "gut feelings," he claimed that trial counsel had been bribed by Sherri's parents.

We find the State's argument has merit. K.S.A. 22-4503(a) provides that a "defendant charged . . . with any felony is entitled to have the assistance of counsel at every stage of the proceedings against such defendant." Entitlement eases into discretion following an appeal. K.S.A. 22-4503 governs pretrial and trial proceedings. Under K.S.A. 22-4505, an indigent defendant also is entitled to appointment of counsel on appeal. K.S.A. 22-4506 governs entitlement to counsel of persons in custody after felony convictions. It provides in pertinent part: "(b) If the court finds that the petition or motion presents substantial questions of law . . . the court shall appoint counsel . . . to assist such person."

Thus, there is no statutory requirement for "appointment of counsel at each and every post-trial motion . . . and such a decision rests within the sound discretion of the trial court." *Andrews,* 228 Kan. at 377. In post-conviction proceedings, there also is some latitude in the constitutional requirement that a

defendant be represented at critical stages. See 228 Kan. at 377-78.

In *State v. Pierce,* 246 Kan. 183, 787 P.2d 1189 (1990), this court concluded that defendant was neither constitutionally nor statutorily entitled to be represented by counsel on his pro se post-appeal motion to modify his sentence pursuant to K.S.A. 21-4603(3). This court counseled that the trial court should scrutinize such motions for signs of "a realistic basis for a reduction of sentence." 246 Kan. at 198. If it appears that the motion may have some merit,

"then the trial court in the exercise of its discretion should set the matter for hearing and appoint counsel to represent the defendant. If there is to be a hearing at which the State will be represented, then due process of law does require that the defendant be represented unless the defendant waives the right to counsel. See *State v. Buckland,* 245 Kan. 132, 142, 777 P.2d 745 (1989)." 246 Kan. at 198-99.

In the present case, the pro se motion defies categorization. It was not made in a timely manner as a motion for new trial. It preceded appeal, however, and trial counsel still was representing Kingsley. He was not advised or questioned about waiving his right to counsel. He was present at the hearing on his pro se motion, but he was not represented by counsel who advocated his position. The State was represented at the hearing. The trial court's ruling on the pro se motion was on its substance, and no mention was made of the motion being untimely. The trial court did note that there was some irregularity in the filing but passed over it to reach the merits.

In the circumstances of this case, Kingsley did not have an absolute right to appointment of counsel other than trial counsel to represent him on his pro se motion. First, the motion was untimely. Second, his motion does not contain a "realistic basis" for a new trial. Third, on appeal he neither argues that trial counsel was ineffective nor raises any of the issues in his pro se motion.

Kingsley next argues that the admission of certain exhibits was repetitious and unduly prejudicial. It appears that the exhibits of which he complains are Exhibit 50, a photograph of Baker's pubic hair and some burnt matches; Exhibit 57, the bloody bra and shirt of the victim; and Exhibits 58-67, autopsy photographs.

Also mentioned in the argument are Exhibit 27, a videotape of the crime scene, and Exhibit 56, a photograph of the victim's body at the crime scene. They seem to be included in the discussion to make the point that the other exhibits are repetitious.

Photographs. Trial counsel filed a motion in limine requesting that the district court review the State's photographs for the purpose of determining whether they were cumulative and more prejudicial than probative. The motion was denied. The district court stated that "the objection of cumulative is one which can be made at trial after review."

This court requires that "[w]hen a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue for appeal." *State v. Nunn*, 244 Kan. 207, Syl. ¶ 5, 768 P.2d 268 (1989).

During the pretrial conference, defense counsel and the prosecutor had the following exchange:

"[Defense counsel]: I would like to bring up one matter that I always find kind of a stumbling block, and that is I've made some motions in limine, I've made some motions to suppress. It's my understanding that I cannot rely on having made a pretrial motion. I have to object at the time that it's introduced. And I often find that very awkward; obviously not always the wisest thing to do in front of a jury. What I would like to do is make the same agreement with the State that I have made in the past, and that is that upon appeal, the issue of a contemporary—excuse me—yes, contemporaneous objection will not be used against those issues which have been litigated by pretrial motions.

"[Prosecutor]: That's correct. [Defense counsel] and I have had that agreement in the past, and I find it to be acceptable."

The court's only comment was, "All right. Good."

On appeal Kingsley asserts that defense counsel preserved the issue of the admissibility of the photographs for appellate review and makes reference to the record of the agreement reached during pretrial conference. The agreement, made on the record and with the assent of the district court judge, seems to be analogous to a continuing objection to the introduction of certain evidence. Its admission, therefore, lies within the scope of this court's review.

Consideration of the matter, however, does not end there. On appeal the State takes the position that this court may not review the admission of the autopsy photographs, with the exception of

Exhibit 59. It urges that the following discourse superseded the agreement:

"[Prosecutor]: Your Honor, I move for the admission of State's Exhibits Nos. 58 through 67 [autopsy photographs]. I tender them to counsel for inspection.

"[Defense counsel]: My position remains as previously discussed. I would object to [Exhibit] 59 being admitted as cumulative.

"THE COURT: Would counsel approach, please.

(There was a discussion at the bench between Court and counsel out of the hearing of the jury and the reporter.)

"THE COURT: Objection overruled. Exhibits 58 through 67 will be admitted."

Without knowing the content of the unrecorded discussion, it is difficult at best to form an idea of what exactly was going on. If defense counsel had stopped after saying that her position was unchanged, there would be no question that the pretrial agreement covered this offer of evidence. Defense counsel, on the one hand, reiterated her previous position but, on the other, singles out Exhibit 59 for objection.

With regard to Exhibit 50, the State points out that defense counsel expressly stated that she had no objection. The State's position is that this court's review of its admission, therefore, is barred. The State, however, points to nothing in the record which indicates that the pretrial agreement was no longer in effect at the time the State moved for the admission of Exhibit 50. There was nothing in the agreement which required a reference to it at the time objectionable evidence was offered. The State is therefore barred by the pretrial agreement from raising the contemporaneous objection rule in this appeal.

In any event, it is well established that photographs such as these autopsy photographs and the photograph of burnt matches in Donna Baker's pubic hair are admissible. The rule is stated in *State v. Shehan,* 242 Kan. 127, Syl. ¶ 8, 744 P.2d 824 (1987):

"The law is well settled in this state that in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome."

Bra and Shirt. Exhibit 57 was described as being a sheet of posterboard approximately three feet by four feet with Donna

Baker's bloody turtleneck or cowlneck shirt and bra attached to it. Defense counsel objected on the ground that the display was far more inflammatory than probative. The State gave two reasons why it was probative. First, it corroborated some testimony as to what the victim had been wearing. Second, it tended to show the defendant's premeditation. In this respect the State argued that the display showed that there were no knife holes in the shirt or bra where the victim's stab wounds were located in her chest. It was the State's contention that the defendant pulled the victim's bra and shirt up from her chest area, stabbed her five times, pulled the shirt back down, and then slit her throat.

K.S.A. 60-445 provides that "the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered." Gard notes that, despite the wording of the statute, the element of surprise does not get factored into the equation. Comments, 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-445 (1979). Here, the district court judge weighed the prejudice potential of the evidence against its probative value and found the latter to outweigh the former.

By their very existence, exhibits in a murder trial are gruesome and unsettling. The exhibits here are no exception. The autopsy photographs were referred to during the pathologist's testimony. The photograph of the pubic region showed an attempt to burn the body. The clothing display showed that the clothing had to have been moved before the victim was stabbed and moved again before her throat was cut. The videotape and the photograph of the body showed the crime scene.

We find no abuse of the district court's discretion in the admission of the exhibits.

Kingsley next contends that the wording of the district court's mid-deliberation instruction on premeditation was erroneous. During their deliberations the jurors sent this question to the judge: "Clarification of meaning of premeditation as to time frame. Before he went to the Baker residence or after he was at the residence."

Defense counsel asked the district court to respond by suggesting to the jurors that they re-read the previously given Instruction No. 5. The pertinent portion of that instruction states: "Deliberately and with premeditation means to have thought over the matter beforehand." Defense counsel stated that she wanted the jurors to re-read Instruction No. 5 because "[t]here is no reference to a certain amount of time in that." What defense counsel asked the court not to do was answer the question, that is, apply the law to the facts of this case and answer "before" or "after."

The district court judge reasoned that the jury's uncertainty about the meaning of one of the important instructions warranted a response. The court made the following response: "Premeditation under the law does not require any specific time frame. Please review instruction five."

The district court judge and defense counsel then had the following exchange:

"THE COURT: Understanding that you object to my responding, [defense counsel], do you have any specific objection to the response I plan to make?
"[Defense counsel]: No. I don't. I heard it, Judge. I was thinking.
. . . .
"THE COURT: So you have no objection to that language?
"[Defense counsel]: No."

On appeal Kingsley argues that the additional instruction erroneously "allowed the jury to conclude that premeditated and deliberation can occur instantaneously with the killing." Thus, the argument continues, the State was relieved of its burden of showing premeditation.

The State contends that the clearly erroneous standard applies to this court's review of the substance of the additional instruction because trial counsel's objection was to the court's responding and not to the substance of the response. The State relies on *State v. Serviora*, 206 Kan. 29, 34-35, 476 P.2d 236 (1970). The State's position is in accord with *Serviora*.

Irrespective of the standard of review, there is not any error in the district court's additional instruction. In one of the cases cited by Kingsley on this issue, the following discussion occurs:

"The trial court gave the substance of the standard premeditated murder instruction, PIK Crim. 2d 56.01, to which the court added the following:

'There is no specific time element required to establish premeditation.' Also, the trial court gave the following definition from PIK Crim. 2d 56.04(b), which reads in part: 'Deliberately and with premeditation means to have thought over the matter beforehand.' " *State v. Patterson,* 243 Kan. 262, 268, 755 P.2d 551 (1988).

In concluding that there was no error, this court stated that these instructions on premeditation "correctly state the law." 243 Kan. at 269. The same instructions were given in the present case. We do not find the mid-deliberation instruction to be erroneous.

Kingsley next argues that the State's exercise of peremptory challenges to exclude black prospective jurors was a violation of equal protection. In the recent case of *State v. Clemons,* 251 Kan. 473, 836 P.2d 1147 (1992), this court considered the strike of a white prospective juror who expressed concern over the racial composition of the jury. The following rule was stated:

"A criminal defendant may object to the race-based exclusion of jurors effected through a prosecutor's use of peremptory challenges regardless of whether the defendant and the excluded juror share the same race. A same-race limitation on a defendant's right to object violates the substantive guarantees of the Equal Protection Clause. Under those guarantees, a prosecutor is prohibited from using peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race." 251 Kan. 473, Syl. ¶ 3.

Kingsley is white. There were two black members on the jury panel which heard the case. At the time of trial, Kingsley objected to the exclusion of two black prospective jurors, Betty Ewings and James Dukes. The district court ruled that the reasons given by the prosecutor for striking them were "clear, reasonably specific, neutral, legitimate, and sufficiently related to this case."

This court has stated that "appellate review of a trial court's acceptance of the State's announced reasons for removal of a juror as being racially neutral is on the basis of abuse of discretion." *State v. Sledd,* 250 Kan. 15, Syl. ¶ 2, 825 P.2d 114, *cert. denied* 121 L. Ed. 2d 98 (1992).

In *State v. Belnavis,* 246 Kan. 309, 312, 787 P.2d 1172 (1990), the analysis to be undertaken by this court is set forth:

"In order to determine whether the State has successfully provided a race-neutral explanation for the peremptory challenges, we must compare the characteristics of the individuals stricken with those not stricken. A prosecutor's explanation fails to be racially neutral if characteristics of a

[minority] person struck are present in white panel members not challenged by the State. *U.S. v. Wilson,* 853 F.2d 606, 610 (8th Cir. 1988)."

In the present case, the State gave the following reasons for striking Betty Ewings:

"It's the State's position, Your Honor, that the reason we're asking her to be excused is a neutral, nondiscriminatory reason not based in any way on her race. The State has examined the witness and finds that Ms. Ewings is not a long time resident of the State of Kansas, has no vested interest in this community. She has moved from place to place and location to location. She has indicated that her mind would be on her school, although she was candid in her replies to the questions that I asked.

"One of the things of course that concerned me was she doesn't even know what her husband does for a living at the present time. I am concerned about her ability to listen and comprehend the evidence and to weigh it in a manner that is consistent with the instructions and feel that I've articulated reasons that would allow her to be excused without regard to her race.

"And the Court should note as well that there are several other people on the jury who are black that have not been excused by the State and [I] don't intend to excuse Mrs. Ogletree, who is black, Ms. Young, who is black, . . .

. . . .

"I also neglected to put in the additional basis that Ms. Bacon, counsel for the defendant, worked at the Derby school system apparently at a time period in which Miss Ewings might have been in that school system."

The district court made the following observations:

"The record is not at all clear whether or not Mrs. Ewings was employed with the Derby school system at the same time Ms. Bacon was. That seems doubtful given what Mrs. Ewings said about her tenure with the Derby system and the number of years that Ms. Bacon has been practicing law added into the number of years it would have taken her to get through law school. Nonetheless, there is that potential relationship or potential perceived relationship.

"It of course is not a requirement of a juror that he or she be a life-long member of the community, nor can one necessarily presume that a life-long member of the community has any particular perceived investment in the community, more particularly any perceived investment in how this case should be decided. But the Court cannot say that that is not something the prosecutor may use as a criteria. And certainly that would be a neutral criteria.

"Perhaps most importantly it is significant to the Court that thus far two panel members have indicated that the approach of the school year and their job duties with respect to the school year would be some cause for concern for them if they were chosen as jurors in this case. Both went on to say that they of course would set that aside and would give their full

attention to the issues in this matter. But the attorneys for the State may nonetheless consider that the problem was raised by the prospective jurors in the first place, and the two prospective jurors who have raised that concern have both been excused by the State, one of which being Mr. Skupa who is a white male, the other being Mrs. Ewings, who is a black female.

"The Court is satisfied that the reasons propounded by the State's attorneys are clear, reasonably specific, neutral, legitimate, and sufficiently related to this case to overcome any of the concerns which the *Batson* and *Hood* rules are designed to protect."

One of the reasons offered by the State for excluding Ewings was her expressed desire to be in school when it started. When asked whether her desire to be in school would prevent her from paying undivided attention to the case, Ewings replied: "No, I— I don't think so, but I would—like I said before, I would be honest and say I would like to be there, yes, but I would have to put that aside if I were on this case."

Kingsley contends that the State did not strike a white prospective juror, Willie Jefferson, who expressed a "similar concern." In fact, Jefferson was much more negative than Ewings about his ability to be a fair and impartial juror due to his mind being on school. Here is the pertinent portion of his voir dire questioning:

"[Prosecutor]: Tell me about school starting. When is that?

"JUROR JEFFERSON: For me it starts tomorrow.

"[Prosecutor]: Oh, goodness.

"JUROR JEFFERSON: We get students on Monday a week from today.

"[Prosecutor]: How would you feel about serving as an alternate on a jury? Now, and you're—now, I'm going to tell you once again, you're the expert, so don't pull any punches. Just go ahead and tell me how you feel.

"JUROR JEFFERSON: I've got some concerns about it because problems we've got with the district right now, and I've talked with my principal about it and they would like for us to really be in the classroom at the time we're getting ready to start.

"[Prosecutor]: Do you feel the fact that you might be called on to serve as a juror in this case would interfere or your business concerns would interfere with you serving as a juror in this case?

"JUROR JEFFERSON: Good possibility it might because especially if it's going to carry over into next year—next week.

"[Prosecutor]: Not next year.

"JUROR JEFFERSON: Next week.

"[Prosecutor]: I know you corrected yourself. I—you know, obviously we want individuals to be able to serve on juries, and we are cognizant, aware

of commitments, but the test is whether or not you feel that you could give this case your undivided attention. And if you feel you could put aside like some people in this community would like to put aside what's happening with the school board.

"JUROR JEFFERSON: Yes.

"[Prosecutor]: Then, you know, that's the question I guess I would have for you. So do you feel that you could be a fair and impartial juror in this case?

"JUROR JEFFERSON: I believe I possibly could. I have some concerns about all the things I have in mind, you know, being honest about it, you know."

Jefferson was being considered as an alternate juror rather than as a member of the jury panel. He did not serve. The State requested that the district court excuse him for cause based on his preoccupation with starting the school year, the school district being "in flux," and his connections with some witnesses. The district court denied the request. In his brief, Kingsley asserts that Jefferson "was eventually stricken by the defense," although the record neither supports nor controverts that assertion.

Neither party brings to the court's attention any authority on the effect, if any, of the State's request that Jefferson be excused for cause. In addition, the question may be somewhat confounded by Jefferson's having been a prospective alternate, rather than regular, juror. Neither party has furnished any authority which touches on the comparison of prospective jurors with alternate or prospective alternate jurors.

The other novel aspect of these circumstances is that the comparison of Ewings with Jefferson is a comparison of stricken with stricken, rather than stricken with non-stricken. According to defense counsel, because the strike was made by defense counsel after the State's strike-for-cause request failed, there would not seem to be any reason why the comparison should not be effective; that is, defense counsel should not be constrained from striking prospective jurors who have been passed over by the State in order to preserve them as comparables for a *Batson* challenge.

Jefferson's reluctance to serve as an alternate juror in this case is palpable. Ewings' hesitation seems mild in comparison. If the State did not exercise a peremptory challenge to exclude Jefferson, when it did exclude Ewings, the credibility of the "school

distraction" explanation is in question. See *Belnavis,* 246 Kan. at 313.

It also should be noted, however, that at the time the district court considered the State's explanation for striking Ewings, Jefferson had not yet been questioned. Thus, the comparison which this court is examining was not available to the district court. Instead, the district court considered that two prospective jurors, one white and one black, who had expressed concern about their job duties in the approaching school year had been excused by the State.

The State also offered other reasons for excluding Ewings. The State questioned her ability to comprehend the evidence and the instructions because "she doesn't even know what her husband does for a living at the present time." Ewings' statement in this regard was made when she was asked what her husband did at Boeing: "His basic job is aircraft inspector, but they were laid off and now he's doing something else which I don't really know exactly what it is." The district court did not mention this reason.

On appeal, the State urges this court to consider other responses given by Ewings which tend to show that she had "difficulty answering other simple questions." For example, when asked "what year" her daughter was at UNLV, she said, "Well, I think probably her—year and a half." Ewings went on to explain that her daughter previously had attended two other colleges before transferring to UNLV. In the circumstances, her hesitancy in formulating an answer to "What year is she?" probably was justified. Likewise, in talking about her own education, Ewings was neither articulate nor particularly coherent.

The State noted that Ewings had moved from place to place and was not a long-time resident of Kansas. The district court expressed doubt about the efficacy of this criterion, but concluded that it was "neutral." The district court did not mention whether or how this criterion had been applied to other prospective jurors.

On appeal, the State concedes that Ewings had lived in Wichita for 10 years and had a son in school in Butler County. The record shows that Ewings had been employed by the Derby school district throughout that 10-year period. The State argues that the length of residence is not the point and that earlier moves and failure to consider Wichita her home is the point. The State

asserts that none of the jurors "viewed Wichita as a point of transition, as did Ewings." When the State asked whether Wichita was "going to be your home," Ewings replied, "We don't really know."

Kingsley contends that Ewings shared characteristics with non-black jurors; none of those mentioned, however, is relevant to this issue, and Kingsley's argument gains nothing from the comparison.

The State also questioned whether Ewings and defense counsel might have worked in the Derby school system at the same time. The district court doubted that their paths had crossed, but concluded, "[n]onetheless, there is that potential relationship or potential perceived relationship."

As to James Dukes, the State gave the following reasons for striking him:

"[I]n looking at Mr. Dukes, first of all, I had a—a lot of questions for him because I was concerned about his youth and his lack of experience. He's not had very much life experience. And I—on the risk of having this appear in an appellate case, he just seemed a little flaky. And so I went on to question him. He did not appear attentive during my questioning. He was rocking back in the chair. And when I questioned him regarding his—his wife and her occupation, he was at a loss to talk about what his wife had done for a living at a time prior to March when she had been employed as a teller in Bank IV, which leads me to believe that he's not paying very much attention to what's going on in his life if he'd been married to her for a year and a half. That was a concern to me.

"Again, this individual, while it is not a criteria that you be a life-long resident of the community, he has moved from Texas to Oklahoma to Wichita, has been here and says he'll just test it out for a while. He has—comes from a—not a very stable home or background, and it did not reasonably appear that he, in a case of this nature, which would have some complicated legal issues, had some difficulty in grasping concepts and understanding."

Defense counsel corrected the prosecutor's impression: "I thought he said his wife had worked there a year and a half but he had just married her last March."

Even after the correction, however, the incorrect impression was perpetuated by the district court judge, who made the following observations:

"I have already addressed the question about a juror's short term, temporary or transient residence in this county or state. Mr. Dukes also described that.

"I hesitate to use the word flaky, but it is rare that a potential juror who works for a food manufacturer declines to describe the nature of his work or the nature of the product that his company sells based on the fact that the food products are secret even though they're in the retail market. And that, together with his inability to respond to even fairly basic questions about his wife and her background would seem to suggest that this is an individual who, while I hesitate to use the word flaky, might not give full attention to the issues to be resolved in a case such as this.

"Mr. Dukes is a juror whose responses were unlike any of those we had from any of our other panel members, and I am satisfied that the State's explanation is clear, reasonably specific, neutral, legitimate and related to the issues which must be decided in this case."

The State raised at least five questions about Dukes—lack of life experience, "flakiness," transience, unstable background, and difficulty in grasping concepts. The district court alighted briefly on the issue of his transience and then settled on the issue of his "flakiness." It seems clear that Dukes gave the impression of being odd and out-of-step, but Kingsley argues that Dukes' unusual responses were not indicative of his ability to grapple with the jury's issues. The State argues otherwise.

The State contends that Dukes was not suited for jury service. The signs the State points to are his difficulty answering simple questions and his inattentiveness, which was demonstrated by his "rocking back in the chair." The State cites *State v. Hood*, 245 Kan. 367, 374, 780 P.2d 160 (1989), for its holding that the court can take into consideration a prospective juror's body language, along with other neutral reasons, when deciding whether the prosecution has a valid, neutral reason for striking the juror. The district court obviously shared the State's impression of Dukes as a prospective juror.

In *United States v. Esparsen*, 930 F.2d 1461, 1468 (10th Cir. 1991), the court stated:

"Although the mere presence of members of a certain race on the final jury does not automatically negate a *Batson* violation, *Clemons*, 843 F.2d at 748, it can be a relevant factor, particularly when the prosecution had the opportunity to strike them. *See United States v. Grandison*, 885 F.2d 143, 147 (4th Cir. 1989), *cert. denied* 495 U.S. 934, 110 S. Ct. 2178, 109 L. Ed. 2d 507 (1990) (one factor disproving discrimination was that prosecution did not exercise its last challenge, although Afro-Americans remained in the venire)."

In *United States v. Grandison,* 885 F.2d 143, 147 (4th Cir. 1989), the court's discussion includes the following:

"While the racial composition of the actual petit jury is not dispositive of a *Batson* challenge, neither was the district court precluded from considering it. Here two of the twelve petit jurors were black. Although the mere presence of minorities on the jury does not mean that a *Batson* prima facie case cannot be made, *Lane,* 866 F.2d at 105; *Clemons,* 843 F.2d at 747; *United States v. Cartlidge,* 808 F.2d 1064, 1070 (5th Cir. 1987); *Fleming v. Kemp,* 794 F.2d 1457, 1483 (11th Cir. 1986), the fact the jury included two black jurors is significant. *See Lane,* 866 F.2d at 106; *Montgomery,* 819 F.2d at 851; *United States v. Williams,* 822 F.2d 512, 515 (5th Cir. 1987); *United States v. Dennis,* 804 F.2d 1208, 1211 (11th Cir. 1986). This is especially so where, as here, the government could have used a remaining strike against those jurors but three times declined to do so. *See Lane,* 866 F.2d at 106; *Saqineto-Miranda,* 859 F.2d at 1522; *Woods,* 812 F.2d at 1487; *Williams,* 822 F.2d at 515; *Montgomery,* 819 F.2d at 851; *Dennis,* 804 F.2d at 1210-11."

In the present case, there were two black jurors. There are a number of courts which permit consideration of the racial composition of the actual jury in determining whether a prima facie showing has been made. Here, the question is whether the racial composition of the actual jury bears consideration after the burden has been shifted to the State to establish race-neutral reasons for its strikes. We find it is one of several factors to be considered. In viewing all the factors in the present case, we do not find the district court abused its discretion in finding race-neutral reasons for the State's peremptory challenges of Ewings and Dukes.

We next consider if the defendant can be convicted of aggravated arson when the person in the house was dead before the fire was set.

K.S.A. 21-3718 provides as follows: "(1) Arson is knowingly, by means of fire or explosive: (a) Damaging any building or property in which another person has any interest without the consent of such other person; or (b) Damaging any building or property with intent to injure or defraud an insurer or lienholder." K.S.A. 21-3719 provides: "Aggravated arson is arson, as defined in section 21-3718, and committed upon a building or property in which there is some human being."

Kingsley argues that the term "human being," as used in the statute, should not include a dead body because a human being

is a living thing. Donna Baker, by all accounts, was dead by the time the fire was started. Kingsley acknowledges that *State v. Case*, 228 Kan. 733, 620 P.2d 821 (1980), runs counter to his position. In that case, defendant moved to dismiss the charge of aggravated arson on the ground that both victims were dead before the fire was set. This court stated: "It is argued that under such circumstances there was no 'human being' in the house as required by K.S.A. 21-3719. We find no merit in such an argument." 228 Kan. at 738. We did not elaborate on the reasons for such a finding. Kingsley emphasizes the court's postscript— "In addition there was evidence that Frank Peterson may have been still alive when the fire was set." 228 Kan. at 738.

Kingsley argues that the holdings in two more recent cases, *State v. Perkins*, 248 Kan. 760, 811 P.2d 1142 (1991), and *State v. Evans*, 251 Kan. 132, 834 P.2d 335 (1992), require live victims to support the charges of rape and aggravated kidnapping, respectively. The rationale for requiring that the victim be living when the unlawful act was committed centers on the nonconsensual nature of the act being committed on the person. See 251 Kan. at 135.

In *State v. William*, 248 Kan. 389, 400, 807 P.2d 1292 (1991), this court decided that attempted aggravated criminal sodomy could not be committed if the defendant knew the victim was dead and the court accepted, as a starting premise, that aggravated criminal sodomy could not be committed against a dead body. In *Perkins*, the court applied the same principle in concluding that "[r]ape can only be committed against a living person." 248 Kan. at 771.

In *Evans*, the court followed the rationale of *Perkins* in concluding that the charge of aggravated kidnapping requires a live victim. The court stated: " 'Person,' as used in 21-3421, implies a living person, and the circumstances when a kidnapping occurs require that the victim be living when the acts constituting the crime take place." 251 Kan. at 135. The circumstances when a kidnapping occurs include the defendant's use of the victimized person for ransom, as a shield or hostage, to facilitate flight or commit a crime, for the infliction of injury or terror, or as a political means. K.S.A. 21-3420.

An essential element shared by the offenses of rape and aggravated kidnapping is the victim's lack of consent to the use being made of his or her body. In contrast, the nonconsensual nature of the act being committed in the offense of aggravated arson is the lack of consent of the property owner to damaging the property. The presence or absence of consent of "some human being" in the property is not an element of the crime. Rape and aggravated kidnapping are not analogues for aggravated arson in this respect.

However, the policy behind elevating arson from a class C felony to aggravated arson, a class B felony, when there is a human being in the property must certainly involve the risk to human life and safety. There is no risk to human life or safety when there is no living person in the property. We are not aware of any rational basis to interpret a human being as other than a living person in the context of the aggravated arson statute.

Webster's New Twentieth Century Dictionary 883 (2d ed. 1973) states the initial definition of the adjective "human" as: "1. of or characteristic of a person or persons, such as people have. 2. having the form or nature of a person; that is a person; consisting of people." In defining the word "human" as a noun, it states the definition as "a human being," and in defining the word "being" as a noun, it states the initial definition as: "1. existence; the state of existing; living; life." Webster's New Twentieth Century Dictionary 168. Absent a clear indication from the legislature to the contrary, we must conclude that in the context of K.S.A. 21-3719, a human being is a living person. We disapprove of the statement in *Case* to the contrary.

Here, the district court, relying on *Case,* included the following in the instructions on aggravated arson: "For purposes of this instruction in determining whether there was a human being in the residence, it does not matter if the person in the residence was dead or alive at the time of the damage by fire." The defendant did not object to this instruction, and therefore this court may reverse only if the instruction is clearly erroneous.

An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred, there was a real possibility the jury would have returned a different verdict. *State v. Perkins,* 248 Kan. 760, Syl. ¶ 8. Since

the district court was relying on our statement in *Case,* the defendant's objection would understandably have been denied. However, based upon our decision herein requiring the presence of a living person, the instruction is clearly erroneous.

Based in part on the insufficiency of the evidence, the district court also denied the defendant's motion to set aside the jury's verdict and enter a judgment of acquittal on the aggravated arson charge. On appeal, this court reviews all the evidence, viewed in the light most favorable to the State and, if we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt, the conviction will be affirmed. *State v. Evans,* 251 Kan. 132. In light of our finding that aggravated arson requires the presence of a living person, there is a failure of proof in that respect. The jury could not have concluded beyond a reasonable doubt that aggravated arson was committed where the fire occurred after the victim was dead. We therefore cannot affirm the defendant's conviction for aggravated arson, and the sentence for that conviction must be vacated.

There was, however, sufficient evidence to support the lesser included offense of arson. Where a defendant has been convicted of the greater offense but evidence supports only a lesser included offense, the case must be remanded to resentence the defendant for conviction of the lesser included offense. *State v. Moss,* 221 Kan. 47, 50, 557 P.2d 1292 (1976); *State v. Smith,* 4 Kan. App. 2d 149, 153, 603 P.2d 638 (1979).

Kingsley next contends that the jury should have been instructed on the lesser included offense of voluntary manslaughter, the "unlawful killing of a human being, without malice, which is done intentionally upon a sudden quarrel or in the heat of passion." K.S.A. 21-3403. Voluntary manslaughter is a lesser included offense of first-degree murder. *State v. Seelke,* 221 Kan. 672, 675, 561 P.2d 869 (1977). The defense theory was that the intention was to tie up Donna Baker and rob her. There was no evidence that Kingsley took a weapon with him to Baker's house; there appeared to have been a struggle, and, Kingsley argues, the nature of the wounds suggests that they were inflicted in rage. Defendant's argument is that, if the jury believed that he acted alone, it could have found that he killed Donna Baker "in the heat of passion"; if the jury believed that he found his wife

over Baker's body with a knife, it could have found that he aided and abetted voluntary manslaughter.

Kingsley further argues that the charge of felony murder against him does not relieve the court of its duty to instruct on voluntary manslaughter because the hard 40 penalty which he received does not apply to felony-murder convictions. He acknowledges that this court previously has held that there is no duty to instruct on lesser included offenses where the "defendant was charged with felony murder and the undisputed evidence established the commission of the homicide during the perpetration of a felony." 221 Kan. at 676. However, he argues:

"Since the enactment of the hard-40 penalty, premeditated first-degree murder and felony murder must be viewed as separate offenses carrying separate penalties. For hard-40 purposes the premeditation necessary for premeditated first-degree murder cannot be satisfied simply by felony murder, i.e., a homicide committed during the perpetration of [a] felony. Hence, the trial court's duty to instruct on [a] lesser included offense in this hard-40 case was not defeated by the fact that the killing was committed during the perpetration of a felony."

The State argues that there was no duty for the district court to instruct on voluntary manslaughter because there was no evidence upon which Kingsley could have been convicted of the lesser offense. The State also argues that the mandatory 40-year penalty is irrelevant to determining whether an instruction on a lesser included offense was required. This court has stated that the district court's duty to instruct on lesser included offenses "does not arise unless there is evidence supporting the lesser offense." *Patterson*, 243 Kan. 262, Syl. ¶ 2. The evidence may be weak and inconclusive, but it must provide a basis upon which the accused might reasonably be convicted of the lesser offense. *State v. Armstrong*, 240 Kan. 446, 459, 731 P.2d 249, *cert. denied* 482 U.S. 929 (1987).

The court has stated that the reduction of a homicide to voluntary manslaughter requires provocation which is "calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason." *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985). It does not seem that an older woman's resistance to being subdued so that her belongings could

be stolen fits in the category of provocation "calculated to deprive a reasonable man of self-control."

With regard to the wounds, it seems that Kingsley is referring to the stab wounds in Donna Baker's chest. As he suggests, these wounds might have been inflicted in a rage. Other evidence which Kingsley disregards makes the "cold-blooded" interpretation of the wounds the only reasonable choice. For example, he ignores the evidence that her turtleneck shirt had been pulled up and out of the way and that her bra had been removed before she was stabbed. He ignores the evidence that her shirt was pulled back down and her throat was cut either after she was dead or when she was very nearly dead from the stab wounds.

If Sherri inflicted the wounds, she did so, according to Kingsley's testimony, after Donna Baker was unconscious from a blow on the head. In Kingsley's account, therefore, there is no evidence on which he might reasonably be convicted of voluntary manslaughter. Thus, the district court had no duty to instruct on it. We need not reach the hard 40 aspect of Kingsley's argument as to this issue.

Kingsley also contends that the mandatory 40-year sentence should be vacated on the ground that the jury's verdict on first-degree premeditated murder may not have been unanimous. K.S.A. 1992 Supp. 21-4624(2) provides that a defendant may be required to serve a mandatory term of imprisonment of 40 years "upon conviction or adjudication of guilt of a defendant of murder in the first degree based upon the finding of premeditated murder." K.S.A. 1992 Supp. 21-3401 provides in pertinent part as follows: "(a) Murder in the first degree is premeditated murder or the killing of a human being committed: (1) In the perpetration of or attempt to perpetrate any felony." Before enactment of the mandatory 40-year penalty provision in 1990, K.S.A. 1989 Supp. 21-3401 stated in pertinent part:

"Murder in the first degree is the killing of a human being committed:
(a) Maliciously, willfully, deliberately and with premeditation;
(b) in the perpetration of or attempt to perpetrate any felony; or
(c) in the perpetration of abuse of a child, as provided in K.S.A. 21-3609 and amendments thereto."

Kingsley assumes that conviction of "murder in the first degree based upon the finding of premeditated murder," for purposes

of mandatory 40-year imprisonment, does not include conviction of felony murder. The State does not dispute the assumption. However, we need not determine that question since we conclude the defendant was convicted of premeditated first-degree murder.

Kingsley's argument is that the forms of the instructions and verdicts give rise to the possibility that all the jurors agreed that he committed first-degree murder, but some based their finding on evidence supporting one theory and others based their finding on evidence supporting the alternative theory. In that event, he claims, he has not been convicted by a unanimous jury of "murder in the first degree based upon the finding of premeditated murder," as required by 21-4624(2). We do not agree.

The jurors were instructed that Kingsley was charged in Count One with murder in the first degree, which required proof that the killing was done with premeditation. They also were instructed that he was charged in Count Two with felony murder in the first degree, which required proof that the killing was done while in the commission of aggravated robbery. In Instruction No. 7, which is PIK Crim. 2d 56.02-A (1992 Supp.), the jury received directions for considering the charges. It stated in full:

"In this case the State has charged the defendant with one offense of murder in the first degree and has introduced evidence on two alternate theories of proving this crime.

"The State may prove murder in the first degree by proving beyond a reasonable doubt that the defendant killed Donna J. Baker and that such killing was done while in the commission of aggravated robbery, a felony, or in the alternative by proving beyond a reasonable doubt that the defendant killed Donna J. Baker maliciously and with deliberation and premeditation, as fully set out in these instructions.

"Where evidence is presented on the two alternative theories of proving the crime charged, you must consider both in arriving at your verdict.

"In Instruction No. 6 the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of felony murder, that is the killing of a person in the commission of a felony crime.

"In Instruction No. 5 the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of premeditated murder.

"If you do not have reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty.

"If you have a reasonable doubt as to the guilt of the defendant as to the crime of murder in the first degree, then you must consider whether the defendant is guilty of murder in the second degree."

The jury also was instructed that its "agreement upon a verdict must be unanimous."

The jury placed an "X" on the line next to "Guilty" on the verdict form for the charge of felony murder in the first degree as well as on the verdict form for the charge of premeditated murder in the first degree. According to the instructions, the jury had to be unanimous in its agreement on these verdicts. It appears from the completed verdict forms that the jury necessarily rendered an adjudication of Kingsley's guilt of murder in the first degree based upon a finding of premeditated murder as well as of felony murder.

Kingsley's argument seems to have been sparked by the court's decision in *State v. Hartfield*, 245 Kan. 431, 781 P.2d 1050 (1989). There, the court reaffirmed the rule:

" 'When an accused is charged in one count of an information with both premeditated murder and felony murder it matters not whether some members of the jury arrive at a verdict of guilt based on proof of premeditation while others arrive at a verdict of guilty by reason of the killer's malignant purpose.' " 245 Kan. at 447 (quoting *State v. Wilson*, 220 Kan. 341, 345, 552 P.2d 931 [1976]).

The verdict form completed by the jury in Hartfield's trial "did not require the jury to reach a unanimous decision about the theory used to prove first-degree murder." 245 Kan. at 446. There was no indication on the form "how many jurors believed the State proved felony murder and how many believed the State proved premeditated murder." 245 Kan. at 446. The form, which is reproduced at 245 Kan. at 446, simply required the jury to decide among the following possibilities: not guilty, guilty of first-degree murder, guilty of second-degree murder, guilty of voluntary manslaughter, and guilty of involuntary manslaughter. In this respect, *Hartfield* differs from the present case where the jury completed separate verdict forms for the charges of felony murder in the first degree and premeditated murder in the first degree.

Kingsley next questions the jury's verdict on the mandatory 40-year sentence. K.S.A. 1992 Supp. 21-4624(1) provides that the

State may request a separate sentencing proceeding for a defendant charged with first-degree murder for the purpose of determining "whether the defendant should be required to serve a mandatory term of imprisonment of 40 years."

K.S.A. 1992 Supp. 21-4624(3) and (4) provide that evidence may be presented and that the district court shall instruct the jury as to its deliberations on the sentence recommendation. Subsection (5) provides in pertinent part as follows:

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 1992 Supp. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced pursuant to K.S.A. 1992 Supp. 21-4628 and amendments thereto; otherwise, the defendant shall be sentenced as provided by law."

Imprisonment pursuant to K.S.A. 1992 Supp. 21-4628 is for life without eligibility for parole until 40 years have been served. Three of the eight aggravating circumstances enumerated in K.S.A. 1992 Supp. 21-4625 were submitted to the jury in the present case:

"(3) The defendant committed the crime for the defendant's self or another for the purpose of receiving money or any other thing of monetary value.

. . . .

"(5) The defendant committed the crime in order to avoid or prevent a lawful arrest or prosecution.

"(6) The defendant committed the crime in an especially heinous, atrocious or cruel manner."

The jury found that each of the three aggravating circumstances was present and found that they were not outweighed by mitigating circumstances. The jury recommended that Kingsley be sentenced to the hard 40.

Kingsley contends that there was insufficient evidence to establish aggravating circumstances (3) and (5), murder for pecuniary gain and murder to avoid arrest or prosecution. K.S.A. 1992 Supp. 21-4627(3)(b) provides the following with regard to appellate review of a hard 40 sentence:

"(3) With regard to the sentence, the court shall determine:

. . . .

"(b) whether the evidence supports the findings that an aggravating circumstance or circumstances existed and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances."

The State contends that the standard of review for the sufficiency of evidence relevant to the question of sentence should be the same as for the sufficiency of evidence relevant to the question of guilt. The State cites *State v. Graham,* 247 Kan. 388, 398, 799 P.2d 1003 (1990), for the familiar maxim:

"When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt."

Kingsley does not advocate what the standard should be.

Kingsley's argument with regard to aggravating circumstance (3), murder for pecuniary gain, is that the murder must be an essential prerequisite to financial gain, such as a murder to obtain life insurance proceeds. He relies on cases from other states, without showing (or even arguing) that the statutory schemes from those states parallel the Kansas hard 40 scheme. As Justice McFarland noted in *State v. Bailey,* 251 Kan. 156, 834 P.2d 342 (1992), the general scheme for jury involvement in post-trial sentencing proceedings has developed in states which have a death penalty. "Because of concerns . . . over the finality and severity of the imposition of the death penalty, the hurdles the prosecution must clear if the death penalty is to be imposed are higher than in any other area of criminal law." 251 Kan. at 171. For this reason, cases which have arisen in the context of the death penalty are of limited precedential value for this court. 251 Kan. at 171. Each of the out-of-state cases relied on by Kingsley involved imposition of the death penalty.

The language of some of the statutes at issue in the cases cited by Kingsley differs from that of K.S.A. 1992 Supp. 21-4625. For example, an aggravating factor considered by the jury in the Oklahoma case of *Boutwell v. State,* 659 P.2d 322, 328 (Okla. Crim. 1983), provided: "The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration."

The gist of Kingsley's argument is that the pecuniary gain aggravating circumstances must be interpreted narrowly enough to avoid a substantial overlap between felony murder, which he contends is not subject to the hard 40, and murder for financial gain. In other words, Kingsley contends that the pecuniary gain aggravating circumstance may not be established by a killing which incidentally occurs during the commission of an inherently dangerous act, but may be established by a killing which is the consideration for financial gain. He contends that there was insufficient evidence to establish that Donna Baker's death was an essential prerequisite for financial gain.

Defendant argues that penal statutes must be strictly construed in favor of the accused, citing *State v. Magness,* 240 Kan. 719, 721, 732 P.2d 747 (1987). However, we have also held: "The rule of strict construction concerning penal statutes is subordinate to the rule that judicial interpretation must be reasonable and sensible to effectuate legislative design and the true intent of the legislature." *State v. Carmichael,* 240 Kan. 149, Syl. ¶ 5, 727 P.2d 918 (1986).

Assuming for the purpose of argument that Kingsley's interpretation of the pecuniary gain aggravating circumstance is correct and that the standard of review is as the State contends, the question is whether the evidence, viewed in the light most favorable to the prosecution, convinces this court that a rational factfinder could have found that Donna Baker's killing was motivated by Kingsley's desire for financial gain.

The answer is in the affirmative. The evidence which was examined with regard to Issue 6 (lesser included offense of voluntary manslaughter) is relevant here as well. It showed that when Kingsley went to Donna Baker's house to rob her, he knew that she would be in the house. In fact, he had made arrangements by telephone for his visit to her house. He took surgical gloves with him at least in part for the purpose of concealing his fingerprints. Kingsley denied that these circumstances led inexorably to the conclusion that he planned to kill Donna Baker. He argues that Donna Baker knew him by an assumed name, and, thus, if he did not leave fingerprints, he would not be traced by the name Baker would give the police. The weakness in defendant's argument is that Donna Baker knew Kingsley's last name and

certainly could have given the police a good description of him. It is unreasonable to think that some question about the first name would have been much of a stumbling block for law enforcement.

A rational factfinder could have found that Kingsley intended to kill Donna Baker for financial gain. The evidence supports a finding that Kingsley went to Donna Baker's house with the intention of killing her and taking her money and valuables.

Kingsley's argument with regard to aggravating circumstance (5), murder to avoid arrest or prosecution, is that the evidence must show that the arrest was imminent and that its avoidance was the dominant motive for the murder. He speculates that subsection (5) "was likely meant to address situations where a defendant murders a law enforcement officer or civilian who is about to apprehend or prosecute him." Kingsley relies on cases which arose in the death penalty context in other states. *Ex parte Johnson,* 399 So. 2d 873 (Ala. 1979); *People v. Bigelow,* 37 Cal. 3d 731, 209 Cal. Rptr. 328, 691 P.2d 994 (1984); and *Menendez v. State,* 368 So. 2d 1278 (Fla. 1979).

We considered and rejected this argument in *Bailey*. There, defendant challenged subsection (5) as being unconstitutionally vague. We concluded that the subsection was not vague on its face or as applied to the facts of that case. Here is the court's analysis and conclusion:

"When Sylvester escaped, covered with blood, his captors had no way of knowing whether or not he would survive to report the crimes involved or would be too frightened to identify the assailants. Further, Rose Ann, by defendant's own testimony at the sentencing proceeding, was subject to additional crimes Sylvester knew nothing about—anal sodomy and multiple rapes. The jury could well have found she was killed to avoid or prevent a lawful arrest or prosecution." 251 Kan. at 174.

The interpretation of the subsection employed in the *Bailey* analysis was not the narrow construction which is advocated by Kingsley. It did not require that the arrest be imminent, and it did not require that avoiding it was the dominant motive for murder. Nonetheless, the court found that aggravating circumstance (5) was not unconstitutionally vague and was not overbroad. We find *Bailey* controlling on this issue.

Kingsley challenges the constitutionality of aggravating circumstance (6), murder committed in an especially heinous, atrocious, or cruel manner, contending that the subsection is too vague. Precisely the same argument was made in *Bailey* and was rejected by this court. 251 Kan. at 174-75. This court found "the contention that this aggravating factor is unconstitutionally vague in the context of the hard 40 legislation to be without merit and especially so in light of the definitions included in the instructions herein." 251 Kan. at 174. The reference is to jury instructions which defined heinous, atrocious, and cruel. The definitions of heinous and atrocious which were given in *Bailey* also were given in the present case: "Definitions: Heinous, extremely wicked or shockingly evil. Atrocious, outrageously wicked and vile." 251 Kan. at 174.

Cruel was defined by the district court in *Bailey* to mean "pitiless or designed to inflict a high degree of pain, utter indifference to, or enjoyment of the sufferings of others." 251 Kan. at 174. It was defined by the district court in the present case to mean "pitiless or designed to inflict a high degree of pain."

The opinion in *Bailey* was filed in May 1992 and appellant's brief was filed in June; Kingsley does not mention *Bailey* on this issue, although it is cited elsewhere in his brief. He argues that the "district court's attempt to define the [terms] does not save the aggravating circumstance from being unconstitutionally vague." Because the brief writer does not refer to *Bailey,* there is no specific effort made to distinguish it. The abbreviated definition of cruel given in the present case, however, is noted: "The definition given by Judge Royse in this case does not include the expanded definition of 'cruel' set forth in the final draft of the PIK Advisory Committee's proposed instructions, and set forth in *Foster*[*v. State,* 779 P.2d 591 (Okla. Crim. 1989)]."

Kingsley contends that the instruction defining heinous, atrocious, and cruel allowed the jurors "to consider events which occurred after the victim was unconscious or dead." He concedes, however, that the definitions were only part of the instruction on aggravating circumstance (6). The definitions were followed by this statement: "The phrase especially heinous, atrocious or cruel is directed to those crimes where the death of the victim

was *preceded* by torture of the victim or serious physical abuse." (Emphasis added.)

For the proposition that what occurred after the victim died was not relevant, Kingsley relies on *State v. Evans,* 251 Kan. 132, 834 P.2d 335 (1992), and *State v. William,* 248 Kan. 389, 807 P.2d 1292 (1991), which stated that the crimes of aggravated kidnapping and aggravated criminal sodomy require live victims.

The draft of proposed instructions on the hard 40 penalty does not contain the admonition given by the district court in the present case that torture or serious physical abuse must have preceded death. This would seem, however, to be an appropriate instruction. The crime which defendant is accused of committing in an especially heinous, atrocious, or cruel manner is murder. The murder is complete with the death of the victim. Subsequent abuse of the body would not constitute the manner in which the murder was committed. Thus, the jury was correctly instructed that the torture or serious physical abuse of the victim must precede death.

For the proposition that what occurred after the victim was unconscious is not relevant to this aggravating circumstance, Kingsley relies on a death penalty case, *State v. Hunt,* 220 Neb. 707, 371 N.W.2d 708 (1985), *overruled on other grounds* 224 Neb. 282, 314, 399 N.W.2d 706 (1986). In *Hunt,* the jury "had to find that defendant went to the victim's home with the intention of killing her so that he could play out his sexual fantasy with a female corpse." 220 Neb. at 725. Hunt gained entry into the victim's house by pointing a gun at her. 220 Neb. at 711. He tied her arms and legs with rope and stuffed two pairs of women's underwear into her mouth. 220 Neb. at 711-12. One pair was pushed back into her throat so that her nasal passages were obstructed at the time of the autopsy. 220 Neb. at 714. Hunt strangled her into unconsciousness, masturbated, and ejaculated onto her stomach. Hunt testified that she still had a pulse. Then he put her head underwater in the tub; the victim was twitching and shaking. When the telephone rang, he left. 220 Neb. at 712.

The Nebraska court concluded that the aggravating circumstance—especially heinous, atrocious, or cruel—was not present. Here, in part, is the rationale:

"The evidence establishes that the victim was rendered unconscious within a short time of defendant's intrusion into her home. It therefore cannot be said that the murder was of the nature described in aggravating circumstance (1)(d), as specified in § 29-2523: 'The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence.'

. . . .

"In order for aggravating circumstance (1)(d) to be present, the method of killing must entail something more than the ordinary circumstances which attend any death-dealing violence. See *State v. Reeves,* [216 Neb. 206, 344 N.W.2d 433 (1984)], wherein aggravating circumstance (1)(d) was held not to be present where a murder was achieved 'swiftly and suddenly,' but was held to be present in another murder in which the victim, who 'did not die quickly,' was subject to sexual penetration while conscious and defending herself. 216 Neb. at 227, 344 N.W.2d at 447. In contrast, the sexual acts in the present case, as noted earlier, were practiced either on a woman who was unconscious or in whom life had ceased to exist.

"Although the method by which defendant achieved sexual gratification may be accurately described as exceptionally heinous and atrocious, and as manifesting exceptional depravity by ordinary standards of morality and intelligence, the murder itself, given the inherent nature of a killing, cannot." 220 Neb. at 725-26.

The evidence in the present case may not be sufficient to establish that torture or serious physical abuse occurred while Donna Baker was conscious. There were signs of a struggle, but the evidence tends to show that the victim had been rendered unconscious before she was dragged from room to room, before she was stabbed, before her throat was cut, before matches were placed in her pubic hair, and before the house was set afire.

As the State points out, there was blood throughout the house; the State relies on the videotape of the crime scene as evidence. In addition, Sherri testified that Kingsley had described the victim putting up a terrific struggle:

"[H]e used the rest room and came out and had told me that he went berserk, went crazy, tried to, you know, act like he was crazy and stuff. And then she had pulled a knife—a gun on him, and then he went after her, started to strangle her. She was fighting with him. And he kept on trying to strangle her. He told me one time he said he couldn't believe that she wouldn't die and that he finally got her to like pass out and he had used two or three different type knives of hers to slice her throat and stab her.

"Q. Did Mr. Kingsley tell you whether or not he used anything else on her to disable her?

"A. He said he had used a vase to try to knock her out."

*Hunt* does not hold that what occurs after the victim is rendered unconscious is not relevant in determining if the murder was committed in an especially heinous, atrocious, or cruel manner. The court held that the evidence did not support the existence of the two aggravating circumstances. The occurrence of the acts after the victim was unconscious was one factor considered by the court in making that determination. As previously noted, *Hunt* is a death penalty case and, as we stated in *Bailey*, such cases "are, accordingly, of limited precedential value" in hard 40 cases. We also note that in *Hunt*, three justices dissented, finding that the evidence did support the existence of the aggravating circumstances.

We are not persuaded that what occurs after the victim is rendered unconscious is not relevant in determining if the victim was murdered in an especially heinous, atrocious, or cruel manner. What is relevant to that determination is the manner in which the victim was murdered. That determination ends upon the death of the victim and not when the victim is rendered unconscious.

Kingsley also argues that, if this court concludes that the jury erroneously found any of the aggravating circumstances, the hard 40 sentence should be vacated. Kingsley concedes, however, that even in a death penalty case the sentence would not necessarily be vacated. In *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983), imposition of the death penalty was upheld despite the appellate court's striking one of three aggravating circumstances as being unconstitutional.

Kingsley next challenges the district court's refusal to allow a second jury voir dire for the penalty proceedings. In *Bailey*, defendant contended that a second voir dire is authorized by K.S.A. 1992 Supp. 21-4624(2). This court rejected Bailey's argument and stated: "Jury selection procedures, including voir dire, come into play only if a new jury is to be impaneled." 251 Kan. at 170.

Kingsley acknowledges the *Bailey* holding on this issue, but attempts to distinguish his case. Kingsley argues that, irrespective of the statutory provision, a second voir dire was necessary be-

cause it is only after the jurors have heard the evidence on guilt that it can be ascertained what effect it had on them. He asserts that this argument was not advanced by Bailey.

We find no merit in Kingsley's argument. This court's ruling in *Bailey* controls this issue as well. In *Bailey,* this court read 21-4624(2) as contemplating that the same jury would render a verdict on both phases of a trial unless members of the trial jury are unavailable.

Finally, Kingsley argues that the penalty phase instructions erroneously stated the standard of proof for mitigating circumstances. Kingsley contends that the law does not require that mitigating factors be found beyond a reasonable doubt and does not require the jury to be in unanimous agreement on mitigating factors. He argues that the instruction given by the district court "would lead a reasonable juror to believe" that the higher standards applied; as a result, "there is a substantial risk that the recommended sentence is arbitrary and capricious."

The district court gave the following instruction:

"The burden of proof is on the State in this proceeding; the burden of proof does not shift to the defendant. The test you must use is this:

"If, by unanimous vote, you find beyond a reasonable doubt, one or more aggravating circumstances, and further find that such aggravating circumstances are not outweighed by any mitigating circumstances, then the defendant shall be sentenced to imprisonment for life and shall not be eligible for parole prior to serving 40 years' imprisonment."

The instruction closely parallels K.S.A. 1992 Supp. 21-4624(5):

"If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 1992 Supp. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced pursuant to K.S.A. 1992 Supp. 21-4628 and amendments thereto; otherwise, the defendant shall be sentenced as provided by law."

The State does not say what its position is with regard to whether application of mitigating factors depends on a unanimous vote and whether they must be proven beyond a reasonable doubt. The State argues that in the present case the "record is devoid of any mitigating factors." Kingsley contends that the jury was precluded by the erroneous instruction from "weighing the

mitigating circumstances," but he does not specify which circumstances or what evidence there was for finding them.

In *Bailey,* this court noted that the defendant had not indicated what mitigating factors were established. Nevertheless, the court examined the record for mitigating circumstances which could have been established. 251 Kan. at 177. In the present case, the State is correct—the record is devoid of any of the statutory mitigating factors.

In *Bailey,* the court found that two of the statutory mitigating factors "could be considered to have been established." 251 Kan. at 177. Nonetheless, the court stated that it had

"no hesitancy in concluding that the evidence supports the findings of aggravating circumstances and that any mitigating circumstances were insufficient to outweigh the aggravating circumstances. Indeed, under the facts herein any mitigating factors are not only outweighed by the aggravating factors, the aggravating factors overwhelm them." 251 Kan. at 177-78.

Here, the mitigating factors are not overwhelmed, they are nonexistent, and we find no error in the instructions.

The convictions of first-degree murder, aggravated robbery, and forgery are affirmed. The conviction of and sentence for aggravated arson is reversed, and the case is remanded to the district court with directions to resentence the defendant for conviction of arson, a class C felony.